THE HONORABLE JUDGE _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RICHARD L. AHEARN, Regional Director of the
Nineteenth Region of the National Labor
Relations Board, for and on behalf of the
NATIONAL LABOR RELATIONS BOARD

Petitioner

v.

INTERNATIONAL LONGSHORE and WAREHOUSE
UNION LOCAL 21

Respondent

and

INTERNATIONAL LONGSHORE and WAREHOUSE
UNION, LOCAL 4
Respondent

) Civil No. _____
)
)
)
)
)
) MEMORANDUM OF POINTS
) AND AUTHORITIES IN SUPPORT
) OF PETITION FOR TEMPORARY
) RESTRAINING ORDER AND
) PRELIMINARY INJUNCTION
) UNDER SECTIONS 10(j) and
) 10(l) OF THE NATIONAL LABOR
) RELATIONS ACT, AS AMENDED,
) 29 U.S.C §§ 160(j) AND 160(l)]
)
)
)
)
)

ANNE P. POMERANTZ, Regional Attorney, Region 19
DANIEL SANDERS, Attorney, Region 19
JOHN FAWLEY, Attorney, Region 19
HELENA FIORIANTI, Attorney, Sub-Region 36

NATIONAL LABOR RELATIONS BOARD, Region 19
915 Second Avenue, Room 2948
Seattle, Washington  98174, Telephone:  (206) 220-6301

MEMO OF POINTS AND  -   Page 1
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

TABLE OF CONTENTS

I.     Preliminary Statement ........................................................................... 1

II.    The Statutory Schemes Pursuant to Which Injunctive Relief is Sought ................. 3

III.   The Facts .............................................................................................. 7

       A.    The Lease Negotiations between EGT and The Port ................................ 7

       B.    Respondent 21 and the Port ............................................................... 8

       C.    EGT Rejects Demands that It Hire Respondent 21
             Members and Pursues an Alternate Arrangement ....................................... 8

       D.    Respondents Begin Pressuring EGT ......................................................... 10

       E.    Respondents Escalate Their Unlawful Conduct ........................................... 11

IV.    Injunctive Relief is Just and Proper ............................................................... 16

       A.    Petitioner Can Demonstrate A Strong
             Likelihood of Success on the Merits ........................................................ 16

             1.    Applicable Principles ................................................................... 17

             2.    Respondents' Conduct Constitutes Threats and
                   Coercion Pursuant to Section 8(b)(4)(i)(ii) ..................................... 18

             3.    Respondents' Conduct Violates 8(b)(4)(A) ..................................... 19

                   a.    An Object of Respondents' Conduct is to Force
                         EGT and General Construction to Abide by the
                         Terms of the Working Agreement ....................................... 19

                   b.    The Subcontracting and Lease Clauses of
                         the Working Agreement Violate Section 8(e) ..................... 20

             4.    Respondents' Conduct Violates Section 8(b)(4)(B)
                   Because An Object of Its Conduct Was to Force
                   EGT to Cease Doing Business with General ................................... 24

             5.    Respondents 21 and 4 violated Section 8(b)(1)(A) of the Act ........ 26

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1
2

6.    Respondent 4 is Jointly Responsible for
      Respondent 21's Unlawful Conduct ................................................. 27

3        B.    Irreparable Injury Will Occur Absent Sections 10(l) and (j) Relief ............. 27

4        C.    The Balance of Hardships Favors Injunctive Relief .................................... 29

5        D.    The Public Interest Favors Injunctive Relief ................................................. 30

6    V.    Conclusion ............................................................................................................... 31

7

MEMO OF POINTS AND  -    Page ii
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1

TABLE OF AUTHORITIES

2

3 Cases
4 Alliance for the Wild Rockies v. Cottrell,
5    632 F.3d 1127 (9th Cir. 2011) ................................................................ 4, 5
6 Amoco Prod. Co. v. Village of Gambell,
7    480 U.S. 531 (1987) ................................................................................ 27
8 Associated Gen. Contractors of CA v. NLRB,
9    514 F.2d 433 (9th Cir. 1975) ............................................................... 17, 21
10 Bloedorn v. Teamsters Local 695
11 132 L.R.R.M. (BNA) 3102, 3108 (W.D. Wisc. 1989) ................................... 28
12 Carpenters Local 209 (C.E. Wylie Construction),
13    304 NLRB 1098 (1991) ........................................................................... 26
14 Chemical Workers Local 6-18 (Wisconsin Gas Co.),
15    290 NLRB 1155 (1988) ........................................................................... 23
16 Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,
17    598 F.3d 30 (2d Cir. 2010) ....................................................................... 4
18 Colorado Building and Constructions Trades,
19    Council, 239 NLRB 253 n. 8 (1978) ......................................................... 21
20 Compton v. Puerto Rico Newspaper Guild
21    343 F. Supp 884 (D.P.R. 1972) ............................................................... 28
22 Danielson v. Laborers, Local 275,
23 479 F.2d 1033, 1037 (2d Cir. 1973) ........................................................... 28
24 Electrical Workers v. NLRB,
25    366 U.S. 667 (1961) ................................................................................ 17
26 Frankl v. HTH Corp
27    F3d 2011 WL 3250637 ....................................................................passim
28 Frye v. District 1199
29 996 F.2d 141 144 (6th Cir. 1993) .......................................................... 28, 29
30 Grupp v. United Steelworkers of America,
31    532 F. Supp, 102 ............................................................................... 28, 29
32 Hotel & Restaurant Employees Local 531 (Verdugo Hills Bowl),
33    237 NLRB 1204 (1978) ..................................................................22, 23, 25
34 IBEW Local 501 v. NLRB,
35    341 U.S. 694 (1951) ................................................................................ 17
36 Iron Workers (Southwestern Materials),
37    328 NLRB 934 (1999) ............................................................................. 22
38 Iron Workers Dist. Council, Local 29 v. NLRB,
39    913 F.2d 1470 (9th Cir. 1990) ......................................................... 17, 18, 26
40 Kennedy v. Teamsters Local 542,
41    443 F.2d 627 (9th Cir. 1971) ..................................................................... 5

MEMO OF POINTS AND  -    Page i
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

Kobell v. United Paperworkers Int'l Union,
  965 F.2d 1401, 1410-1411 (6th Cir. 1992)................................................................ 30
Kollar v. United Steelworkers of America, Local 2155
  161 L.R.R.M. (BNA) 2307 (N.D. Ohio 1999) ........................................................... 28
Local 812, International Brotherhood of Teamsters v. NLRB,
  947 F.2d 1034 (2d Cir. 1991) ................................................................................... 17
Miller v. California Pac. Med. Ctr.,
  19 F.3d 449 (9th Cir. 1994) ................................................................................ passim
National Woodwork Mfrs Assn. v. NLRB,
  386 U.S. 612 (1967) ......................................................................... 20, 21, 24, 25
NLRB v. Bulletin Co.,
  443 F. 2d 863 (3rd Cir 1971) ................................................................................... 26
NLRB v. Denver Building and Construction Trades Council,
  341 U.S. 675 (1951) .......................................................................................... 17, 18
NLRB v. General Truck Drivers,
  20 F.3d 1017 (9th Cir. 1994) ................................................................................... 18
NLRB v. Hotel & Restaurant Employees Bartenders Union Local 531,
  623 F.2d 61 (9th Cir. 1980) ................................................................................ 20, 22
NLRB v. Longshoremen,
  473 U.S. 61 (1985) ................................................................................................... 17
NLRB v. Miramar of Cal., Inc.,
  601 F.2d 422 (9th Cir. 1979) ................................................................................... 26
NLRB v. Musicians Union, AFM Local 6,
  960 F.2d 842 (9th Cir. 1992) ................................................................................... 17
NLRB v. Operating Engineers, Local 825 (Burns & Roe),
  400 U.S. 297 (1971) ................................................................................................ 21
NLRB v. Pipefitters,
  429 U.S. 507 (1977) ................................................................................................ 17
Overstreet v. United Brotherhood of Carpenters and Joiners of America Local Union No.,
  1506, 409 F.3d 1199 (9th Cir. 2005)................................................................ Passim
Pacific Northwest Chapter v. NLRB,
  654 F.2d 1301 (9th Cir. 1981), .............................................................................. 20
Painters Orange Belt District Council 48,
  276 NLRB 1372 (1985).......................................................................................... 17
Price v. Laborers Local 383
  108 L.R.R.M. (BNA) 3270, 3271-73 (D.Ariz. 1981) affd. 679 F.2d 900 (9th Cir. 1982)................ 28
Retail Clerks Local Union No. 1288 (Nickel's Pay-Less Stores),
  163 NLRB 817........................................................................................................ 21
Retail Clerks v. Food Employers Council, Inc.,
  351 F.2d 525 (9th Cir. 1971) .................................................................................... 3
Scott v Stephen Dunn & Associates
  241 F.3d 652 (9th Cir 2001) .......................................................................... Passim

MEMO OF POINTS AND  -    Page ii
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

Shore v. Building & Construction Trades Council,
173 F.2d 678, 682 (3d Cir. 1949)............................................................. 29
Small v. Operative Plasteres Local 200
611 F.3rd 483(9th Cir 2010) ...................................................... 1, 4
Squillacote v. Meat & Allied Food Workers Local 248,
534 F2d 735 (8th Cir 1976)..................................................... 1, 28, 30
Teamsters Local 251 (Material Sand,
& Stone Corp.), 356 NLRB No. 135, slip op. at 2 (2011) ..................... 27, 29
Union Nacional de Trabajodores, 219 NLRB at 414 (1975).................... 28
Univ. of Tex. v. Camenisch,
451 U.S. 390 (1981) .............................................................. 5
Vincent v. Local 310, IUE
73 L.R.R.M. (BNA) 2136 (N.D.N.Y. 1969)................................ 28
Wilson v. Milk Drivers and Dairy Employees Local 471, 491 F.2d 200, 206 (8th Cir. 1974) ........... 28
Winter v. Natural Res. Def. Counsel,
129 S. Ct. 365 (2008) ............................................................ 4

Statutes
29 U.S.C., § 152(5)............................................................. Passim
29 U.S.C § 157 .................................................................. Passim
Section 158(b) ................................................................... Passim
29 U.S.C § 158(b)(1)(A)..................................................... Passim
29 U.S.C. §§ 158(b)(4)(i) and (ii)(B)...................................... Passim
29 U.S.C. § 158 (b)(7) ........................................................ Passim
29 U.S.C. § 158(e)............................................................. Passim
29 U.S.C. § 160(b).............................................................. Passim
29 U.S.C § 160(j).............................................................. Passim
29 U.S.C § 160(l).............................................................. Passim

MEMO OF POINTS AND  -    Page iii
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

## I.      Preliminary Statement

The Regional Director of Region 19 ("Petitioner") of the National Labor Relations Board ("Board") issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing against International Longshore and Warehouse Union, Local 21 ("Respondent Local 21"), and International Longshore and Warehouse Union, Local 4 ("Respondent Local 4") (jointly, "Respondents") on August 29, 2011 ("Consolidated Complaint") based upon the charges filed by by EGT, LLC ("EGT").  (Ex 6A).[1]  The allegations set forth in the Consolidated Complaint relate to the egregious actions taken by Respondents in furtherance of Respondent Local 21's demands that EGT recognize it as the representative of the EGT employees, including mass picketing in support of that demand.  A hearing on the Consolidated Complaint is scheduled before an Administrative Law Judge on October 11, 2011.

In the interim, however, it was necessary for Petitioner to institute these proceedings pursuant to Sections 10(j) and(l) of the National Labor Relations Act ("Act") [29 U.S.C., §§ 160(j) and (l)][2] seeking a temporary restraining order and preliminary injunction restraining Respondents[3] from engaging in unfair labor practices within the meaning of Sections 8(b)(4)(i) and (ii)(A), (B) and

---

[1]  References herein are to the Exhibits attached to the accompanying Petition.

[2]  Under Section 10(l) of the Act, Petitioner is required to petition the Court for a preliminary injunction against a continuation of the unfair labor practice.  *Retail Clerks Local 137 v. Food Employers Council*, 351 F.2d 525 (9th Cir. 1965).  Injunctions are to be issued under Section 10(l) of the Act provided petitioner meets the "just and proper" standard relied on by the court in *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 455 (9th Cir. 1994) (*en banc*), a case involving injunctive relief under Section 10(j) of the Act 29 U.S.C.§ 160(j)] and affirmed by the court in Section 10(l) proceedings in *Overstreet v. United Brotherhood of Carpenters and Joiners of America, Local 1506*, 409 F.3d 1199 (9th Cir. 2005).  *See also Small v. Operative Plasters' Local 200*, 611 F.3d 483 (9th Cir. 2010).  TROs are appropriate. *Squillacote v. Meat & Allied Food Workers Local 248*, 534 F.2d 735 (7th Cir. 1976).

[3]  At all times material herein, Respondents have been engaged within this judicial district in transacting business and in promoting and protecting the interests of their employee-members.  Respondents are labor organizations within the meaning of §§ 2(5), 8(b), and 10(l) of the Act [29 U.S.C., §§ 152(5), 158(b) and 160(l)].  In addition, the alleged unfair labor practices occurred within this judicial district.  Thus, this Court has jurisdiction in the instant matter.  *See* §§ 10(j)

MEMO OF POINTS AND  -    Page 1
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1    Section 8(b)(1)(A) of the Act pending final disposition of the administrative case.   Under normal

2    circumstances Petitioner would be submitting two separate petitions for injunctive relief under

3    Sections 10(j) and (l) of the Act; however, since the facts, legal theories, and standards in the instant

4    situation are intertwined, this Petition combines the two preliminary injunction requests.   Petitioner

5    seeks the requested relief based on the substantial likelihood that the Board will find that

6    Respondents engaged in unlawful conduct as alleged in the Consolidated Complaint and that it is

7    just and proper for this Court to grant injunctive relief pending a final decision on the merits by the

8    Board.

9        The facts and legal theories also support the request for a temporary restraining order,

10   which is necessary due to the egregiousness of the mass picketing, blocking of ingress and egress,

11   trespassing and interference with rail deliveries, and the stated inability of local law enforcement to

12   deal with the large number of protesters and picketers at the Port of Longview in recent weeks.

13   These actions have had a substantial impact on interstate commerce, which is the underpinning of

14   the Act, as outlined below.  Until the Court can hear the full petition for a preliminary injunction, these

15   unique circumstances make a temporary restraining order appropriate.

16       Petitioner submits that the evidence contained in the affidavits and exhibits filed in support

17   of the Petition for injunctive relief establish that all the injunctive relief requested is just and proper.

---

and (l) of the Act.

MEMO OF POINTS AND  -    Page 2          2948 Jackson Federal Building
AUTHORITIES                               915 Second Avenue
Civil No. _____                      Seattle, Washington
                                          (206) 220-6301

1    II.      The Statutory Schemes Pursuant to Which Injunctive Relief is Sought

2           Sections 10(j) and (l) of the Act authorize United States district courts to grant preliminary

3    injunctions pending the Board's resolution of unfair labor practice proceedings.[4]   These provisions

4    reflect Congressional recognition that, because the Board's administrative proceedings often are

5    protracted, in many instances, absent interim relief, a respondent could accomplish its unlawful

6    objective before being placed under any legal restraint.[5]   Section 10(l) further embodies the

7    determination of Congress that certain unfair labor practices, particularly, secondary boycotts, are so

8    inimical to the public interest and give or tend to give rise to such serious interruptions of commerce

9    as to require their discontinuance, pending adjudication by the Board on the merits, to avoid

10   irreparable injury to the policies of the Act and the frustration of the statutory purpose which could

11   result.  *Retail Clerks v. Food Employers Council, Inc.*, 351 F.2d 525 (9th Cir. 1971).

12          Sections 10(j) and (l) direct district courts to grant relief that is "just and proper."  In the Ninth

13   Circuit, district courts determine whether the relief is "just and proper" under traditional equitable

14   criteria to determine whether interim relief is appropriate.  *Frankl v. HTH Corp.*, --- F.3d ---, 2011 WL

---

[4] Section 10(j) [29 U.S.C. § 160(j)] provides as follows:  The Board shall have power, upon issuance of a complaint … charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district where the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

Section 10(l) [29 U.S.C. § 160(l)] provides, in pertinent part, as follows:  Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of Section 8(b)(4)(A), (B), or (C) [Section 8(b)(7) [Section 158(b)(7) of this title], the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred.  If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law.

1   2725812, at *15 (9th Cir. 2011); *Small v. Operative Plasters' Local 200,* 611 F.3d 483 (9th Cir. 2010);

2   *Overstreet v. United Brotherhood of Carpenters and Joiners of America Local Union No. 1506,* 409

3   F.3d 1199 (9th Cir. 2005); *Miller v. California Pac. Med. Ctr.,* 19 F.3d 449, 459 (9th Cir. 1994) (*en*

4   *banc*).  The "just and proper" standard has been applied by the Ninth Circuit to Section 10(l)

5   proceedings.  *Small v. Operative Plasters' Local 200,* 611 F.3d at 483; *Overstreet v. United*

6   *Brotherhood of Carpenters and Joiners of America, Local 1506*, 409 F.3d 1199 (9th Cir. 2005).

7   Thus, in order to obtain a preliminary injunction, Petitioner must establish 1) a likelihood of success

8   on the merits; 2) a likelihood of irreparable harm in the absence of preliminary relief; 3) that the

9   balance of equities tips in the Board's favor; and 4) that an injunction is in the public interest. *Frankl*

10  *v. HTH Corp.,* --- F.3d ---, 2011 WL 2725812, *15 (*citing Winter v. Natural Res. Def. Counsel*, 129 S.

11  Ct. 365, 374 (2008)), *Small v. Operative Plasters' Local 200,* 611 F.3d at 483; *Overstreet,* 409 F. 3d

12  1199.

13          These elements are evaluated on a "sliding scale" in which the required showing of

14  likelihood of success decreases as the showing of irreparable harm increases.  *See Alliance for the*

15  *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1130-34 (9th Cir. 2011), *Overstreet,* 409 F. 3d 1199.  When

16  "the balance of hardships tips sharply" in Petitioner's favor, Petitioner may establish only that

17  "serious questions going to the merits" exist so long as there is a likelihood of irreparable harm and

18  the injunction is in the public interest. *Frankl,* --- F.3d ---, 2011 WL 2725812, at *15 (*quoting Alliance*

19  *for the Wild Rockies v. Cottrell*, 632 F.3d at 1135).  The "serious questions" standard permits the

20  district court to grant an injunction when it "cannot determine with certainty that the [Petitioner] is

---

[5]  *See Miller v. Cal. Pac. Med. Ctr.,* 19 F.3d at 455, *quoting* S. Rep. No. 105, 80th Cong., 1st Sess. 8, 27 (1947).

MEMO OF POINTS AND  -   Page 4
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1    more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh

2    the benefits of not granting the injunction." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d at

3    1132-33 (*quoting Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598

4    F.3d 30, 35 (2d Cir. 2010)).

5        In cases such as this, the likelihood of success determination "is a function of the probability

6    that the Board will issue an order determining that the unfair labor practices alleged by the Regional

7    Director occurred and that the Ninth Circuit would grant a petition enforcing that order." *Frankl*, 2011

8    WL 3250637, at *16.  In evaluating the likelihood of success, "it is necessary to factor in the district

9    court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB

10   determinations by the courts of appeals." *Id.* (*quoting Miller*, 19 F.3d at 460).  The Regional Director

11   need not prove, however, that the respondent committed the alleged unfair labor practices by a

12   preponderance of the evidence as required in the underlying administrative proceeding.  *See Scott*

13   *v. Dunn*, 241 F.3d 651, 662 (9th Cir. 2001).  Such a standard would "improperly equat[e] 'likelihood of

14   success' with 'success.'"  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981).

15       Rather, the Regional Director makes a threshold showing of likelihood of success by

16   producing "some evidence" in support of the unfair labor practice charge, "together with an arguable

17   legal theory."  *Frankl*, --- F.3d ---, 2011 WL 2725812, at *16.  *See also Scott*, 241 F.3d at 662 (the

18   Regional Director need only show "a better than negligible chance of success").  The Ninth Circuit

19   has observed that, on a motion for injunctive relief, it is not the duty of the district court to resolve the

20   factual disputes or the legal issues involved; rather, it is for the Board to make such resolutions.

21   *Kennedy v. Teamsters Local 542*, 443 F.2d 627, 630 (9th Cir. 1971).  Therefore, the district court

MEMO OF POINTS AND -   Page 5
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1    should sustain the Regional Director's factual allegations if they are "within the range of rationality"

2    and, "[e]ven on an issue of law, the district court should be hospitable to the views of the [Regional

3    Director], however novel." *Frankl*, --- F.3d ---, 2011 WL 2725812, at *16.  Further, "[a] conflict in the

4    evidence does not preclude the Regional Director from making the requisite showing for [an]

5    injunction." *Scott*, 241 F.3d at 662.

6            In evaluating the likelihood of irreparable harm to the Act's policies and in considering the

7    balancing of equities, district courts must "take into account the probability that declining to issue the

8    injunction will permit the allegedly unfair labor practice to reach fruition and thereby render

9    meaningless the Board's remedial authority." *Miller*, 19 F.3d at 459-60. *See also Frankl*, 2011 WL

10   3250637, at *22.  Likely irreparable injury is established by showing "a present or impending

11   deleterious effect of the likely unfair labor practice that would likely not be cured by later relief."

12   *Frankl*, 2011 WL 3250637, at *22.  The Director can make the requisite showing of likely irreparable

13   harm either through evidence that such harm is occurring (*see e.g., Scott*, 241 F.3d at 667, 668), or

14   from "inferences from the nature of the particular unfair labor practice at issue [which] remain

15   available." *Frankl*, 2011 WL 3250637, at *22.  The same evidence and legal conclusions

16   establishing likelihood of success, together with permissible inferences regarding the likely interim

17   and long-run impact of the likely unfair labor practices, provide support for a finding of irreparable

18   harm. *Id., at *23.*

19           As shown below, the issuance of injunctive relief pursuant to Sections 10(j) and (l) of the Act

20   in this case is just and proper.

MEMO OF POINTS AND  -    Page 6
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

III.     The Facts

The dispute underpinning this petition began after EGT, a grain exporter, leased property from the Port of Longview (the "Port"), a working port on the Columbia River.  After decades of no grain handling work being done out of the Port, EGT, in 2009, pursuant to its lease with the Port, began construction of a $200M state-of-the-art grain handling facility. (Ex 9, p.13).   Due to the level of technology, EGT's managerial employees are to be solely responsible for the operation of the control room and the computers which run the automated system.  The only non-managerial tasks to be performed are observational and manual; those will be performed by workers on the system, the train cars in which the grain is delivered, and manipulating the chutes for the grain itself and the hatches on ships that are loaded.  (Ex 9, p. 2).

A.   The Lease Negotiations between EGT and The Port

Negotiations between EGT and the Port over the terms of the lease occurred between 2006 and 2009.   Throughout the negotiations, the parties disagreed as to whether the lease should contain a requirement that EGT employ workers represented by Respondent Local 21 for both its grain handling and lines (aka stevedoring) work.  (Ex 9, pp. 2, 3).  The parties ultimately addressed that issue in the lease agreement as follows:

> Section 6.3 <u>Warranty of Labor</u>:  Lessor warrants that there are no agreements or restrictions affecting the Port, whether Lessor is a party to the same or otherwise, requiring union labor or prevailing wage compliance (a) in connection with the construction of the Lessee Projects or other Improvements on or about the Premises, or (b) except only as expressly set forth the on <u>Exhibit G-2</u> hereto, in connection with the operation of the Ship Dock and the Barge Dock, the handling of cargo at the Facility and the operation of the Facility.
>
> Exhibit G-2 LABOR MATTERS – Lessor expressly refers Lessee to the provisions of the Working Agreement between the ILWU Local 21 and the Port,

MEMO OF POINTS AND -    Page 7
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1  |  dated 1999-2000, as extended through the date of this Lease, for Longview,
2  |  Washington.

3  (Exs 7 and 8).

4  |  After signing the lease containing these provisions, EGT began construction of its state-of-

5  the-art fully automated facility, which took approximately two years.   Construction has been

6  substantially completed at this juncture, and EGT conducted its first dry run of the system in the new

7  facility on July 11, 2011.  (Ex 9, p.3; Ex 10, p.1).

8  |  B.      Respondent 21 and the Port

9  |  Respondent Local 21 has a long-term collective bargaining relationship with the Port

10  ("Working Agreement"), which defines "longshore" work and notes that "The Port of Longview

11  agrees not to lease property for the sole purpose of performing the work described in [its definition of

12  longshore work], unless the lessee is bound by this Agreement."  (Ex 8).  When grain handling was

13  last performed (approximately 30 years ago) at the Port, it was done by Respondent 21's members.

14  (Ex 9, pp. 5, 13).

15  |  C.  EGT Rejects Demands that It Hire Respondent 21
16  |  Members and Pursues an Alternate Arrangement

17  |  At various points in 2010 and early 2011, EGT met with Respondent Local 21 (including its

18  president, Dan Coffman), during which Respondent Local 21 sought to have EGT enter into a

19  collective bargaining agreement, specifically the ILWU Grain Handler's Agreement, relying on the

20  language in the Working Agreement.  (Ex 9, pp. 2, 3).  In sum, the ILWU Grain Handler's Agreement

21  provides that ships can be loaded on an 8 or 10 hour basis and that the Longshoremen are to stop

22  reloading half an hour before shift end and restart loading half an hour after shift end.  (Ex 9, p. 3).

MEMO OF POINTS AND  -    Page 8                        2948 Jackson Federal Building
AUTHORITIES                                           915 Second Avenue
Civil No. _____                                  Seattle, Washington
                                                      (206) 220-6301

1   EGT communicated, *inter alia*, its vision for the plant, explaining the high level of automation of the

2   new facility and the attendant needs for specialized training and ability to load ships on a semi-

3   continuous basis. (Ex 9 p. 3).  EGT indicated its willingness to consider an agreement similar to the

4   one Respondent Local 21 had with Kalama Export at the Port of Kalama, which permits the loading

5   of ships on a semi-continuous basis.  (Ex 9, p.3).  While Respondent Local 21's president initially

6   intimated that he thought they could work something out, Respondent Local 21 was ultimately

7   unwilling to move from its position of having EGT enter into the Grain Handlers' Agreement.  EGT

8   declined to do so and informed Respondent Local 21 by February 2011 that it was considering

9   subcontracting out the limited non-managerial work. (Ex 9, pp. 2, 3)

10          On July 8, 2011, EGT entered into a contract with General Construction ("General") to

11   provide employees to perform EGT's limited non-managerial production and maintenance work at its

12   new Port facility.  (Ex 9, p.2).  EGT and General do not share common ownership, financial control

13   or management, or control of labor relations; their functional interrelation of operations is limited to

14   that necessary to perform the work at the Port facility.  (Ex 9, p. 14).  On July 11, ten General

15   employees began working at the EGT facility at the Port under the supervision of General's

16   employee, George Allison, who also serves as the liaison to EGT's onsite management.  (Ex 10, p.2;

17   Ex 17, p.2; Ex 18, p.1; Ex 19, p.1; Ex 20, p.1).  General voluntarily recognized the Operating

18   Engineers International Union Local 701 ("Local 701") as its employees' exclusive collective

19   bargaining representative on July 15.  (Ex 21).

20          On July 11, the ten General employees began their training regarding unloading grain-filled

21   rail cars and loading grain onto ships utilizing this new technology.  This training has been

MEMO OF POINTS AND -    Page 9
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1   conducted by an EGT contractor and has included training operations tours of the facility by EGT

2   staff; and instructions by EGT staff on the operation of the machines and the system.  (Ex 17, p.2;

3   Ex 18, p.1; Ex 19, p.1; Ex 20, p.1).  While the facility currently has operators on day shift only,

4   Monday through Friday, when fully operational, the facility will require approximately 35 operators

5   and run 24 hours a day, seven days per week.  (Ex 18 p. 2).  At this time, the operators are still in

6   training using grain that is being rerun through the system as the facility, as a result of the picketing

7   described below, is not yet receiving grain shipments.  At no time has EGT itself employed any

8   hourly production or maintenance employees/operators. (Ex 9, p.2).

9          D.      **Respondents Begin Pressuring EGT**

10         After being informed in February, and subsequently, that EGT had declined to enter an

11   agreement with Respondent Local 21, but before execution of the EGT/General contract,

12   Respondents took action.  (Ex 9, pp.2, 3).  On June 3, over 1,000 of Respondent Local 21's

13   members and/or supporting individuals held a protest outside of EGT's Portland headquarters,

14   demanding that EGT hire union labor (presumably, those represented by Respondent Local 21).

15   (Ex 2 p. 5).  On June 14, Respondent Local 21 members and persons identified as being affiliated

16   with Respondent Local 21, based on their t-shirts or picket signs, came onto EGT's site from Berth 8

17   of the dock.  EGT uses Berth 9, which is separated from Berth 8 by a gate.  Hundreds of protesters

18   wearing Union t-shirts and carrying Union picket signs came onto EGT's property and climbed on

19   EGT's grain silos and barge dock.  After some interaction, the police were called to enforce EGT's

20   demand that the protesters leave. (Ex. 9, pp.3, 4; Ex 11, pp.2, 3; Ex 12, pp.1, 2).

21         On July 1, the Port posted a sign on its East Mill Road property, which leads to the EGT

MEMO OF POINTS AND -   Page 10
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1    site, designating it as private property.  Ignoring this sign, beginning around July 1, between 75 and

2    100 protesters wearing Union hats, shirts, clothing, began gathering at the main EGT entrance.  (Ex

3    9, p. 4).  On July 2, the Port's private property sign on East Mill Road had been knocked down. (Ex

4    9, p.4).  After it was put back up, EGT security reported that the protestors knocked it down and

5    dragged it away.  Most days until July 26, there were 20-30 protestors at EGT's facility entrance.

6    Some of the protesters carried hand-painted wood signs bearing the words "EGT Unfair", "ILWU

7    Jurisdiction," "United We Stand, Divided We Fall", "ILWU Local 21", "ILWU Local 4", while other

8    signs just said "ILWU."  The protesters were not generally patrolling, but they were taking pictures of

9    everyone going in and out of the main EGT entrance. (Ex 9, p. 4; Ex 11, pp.1, 3, 4; Ex 14, p. 2).

10            E.  Respondents Escalate Their Unlawful Conduct

11            After EGT entered into the contract with General, Respondents escalated their conduct.  On

12    the morning of July 11, the same morning that the General employees began working and the dry

13    run was performed, Respondent Local 21's President told EGT's manager that the Union was

14    claiming the work.  The two had further discussion, with EGT informing Respondent Local 21 that it

15    intended to run its facility without using Respondent Local 21 and without resort to rules created over

16    30 years ago.  Respondent Local 21's President then handed the EGT manager his phone number

17    and told him to call when EGT was ready to talk.  (Ex 9, p.3).

18            That afternoon, a group of about 100 protesters affiliated with Respondents tore down a 12'

19    wide by 8' tall gate at EGT.  They proceeded to push two rail cars out of EGT's rail shed and climb

20    on top of them.  During this incident, the protesters also poked EGT employees in the chest.  The

21    police arrived and handed out at least 38 citations when the protesters wouldn't leave quietly.

MEMO OF POINTS AND  -   Page 11                         2948 Jackson Federal Building
AUTHORITIES                                             915 Second Avenue
Civil No. _____                                     Seattle, Washington
                                                        (206) 220-6301

1   (Ex 17, p.2).  Among those arrested was Respondent 4's President, Bradley Clark.  Respondent 4

2   represents longshore workers at another nearby Port.  (Ex 9, pp.4, 5; Ex 12, p.2, Ex 22G).

3          Since July 11, Respondents' protesters/picketers, including Respondent Local 21's

4   President Coffman and Vice-President Jake Darren, as well as Respondent Local 4's officers, have

5   been present on an almost 24-hour basis at and around the EGT site.  The picket signs bear the

6   names of Respondents with varying degrees of consistency,[6] and read "EGT unfair," "ILWU

7   Jurisdiction," "ILWU," "Port of Longview ILWU Jurisdiction," and "An Injury to One is an Injury to all."

8   (Ex 9, p 9; Ex 11, p.2; Ex 13, p.4; Ex 14, p.2; Ex 22G).

9          Also since July 11, the picketers have continuously asserted to General employees that this

10  is longshore work and that the General employees are "scabs" who are stealing their work.  (Ex 14

11  p. 4; Ex 20, p. 4).  Some picket signs bear the message "Local 701 Scabs," as does the large

12  inflatable rat balloon maintained by the picketers.  (Ex 17, pp. 3, 4).  Respondent Local 21's

13  President Coffman has stated publicly that Local 701 raided Respondent Local 21 and that he is

14  fighting Local 701 for jurisdiction over the EGT facility.  (Ex 26).  There have been numerous

15  instances of protesters taking pictures of and videotaping General employees as they enter or exit

16  the facility in their vehicles, and picketers telling the employees that they know where they live.

17  (Ex 19, p. 2).  There is even a YouTube video of Respondent Local 4's Vice-President, Rick

18  Anderson, cursing at the occupants of a car. (link to video http://www.youtube.com/watch?v=-

19  vjb0rXH8Ww).  Further, on occasion, General employees have been followed onto the freeway by

20  protesters.  (Ex 17, p.4; Ex 18, p. 4; Ex 20, p.6).

---

[6] Respondent Local 21 has been identified almost every day, while Respondent 4 has been identified a bit less
frequently.

MEMO OF POINTS AND  -   Page 12                          2948 Jackson Federal Building
AUTHORITIES                                              915 Second Avenue
Civil No. _____                                    Seattle, Washington
                                                        (206) 220-6301

1          On the night of July 13, a Burlington Northern and Santa Fe ("BNSF") train tried pulling into

2    EGT's facility to deliver a train of 107 cars of grain product, but was unable to do so.  Hundreds of

3    Respondents' protesters were present both inside and outside the facility gate.  Many individuals

4    obstructed the EGT rail entrance by sitting and standing on or near the tracks.  When the train came

5    to a stop just short of the EGT rail entrance, protestors parked a vehicle on the crossing behind the

6    train, effectively blocking the train in.  Law enforcement unsuccessfully tried to get the protesters to

7    disperse.  When BNSF management learned that the picketers and protesters had refused law

8    enforcement's request to leave the area, it decided that continuing delivery to EGT posed an undue

9    risk of harm to BNSF employees and others.  Accordingly, BNSF ordered the crew to turn the train

10   around and return to Vancouver.  Although it took about two (2) hours to do so, the train was able to

11   turn around and return to its terminal during the morning of July 14 with the still-loaded EGT cars.

12   EGT subsequently received an e-mail from BNSF dated July 14 stating, "Pls give me a call this

13   morning to discuss your security measures at EGT.  We will need a formal plan on security as our

14   ops folks will obviously not deliver with protesters standing/sitting on the tracks."  There are

15   demurrage penalties assessed to EGT for each day BNSF could not unload its train.  (Ex 9, p.5; Exs

16   16A, 16B).

17         On July 15, some protesters stood on East Mill Road leading to the Port, forcing employees

18   to swerve to avoid them.  A group of approximately 50 picketers also blocked EGT employees'

19   ingress and ingress.  (Ex 9, pp, 6, 7; Ex 11, p. 3).  Similarly, protesters began blocking two gates

20   several days later.  (Ex 9, pp. 7, 8; Ex 17, p. 3; Ex 20, p. 4).  On July 18, four separate gates were

21   established at the Port and identified with signs as follows:  Gate 1 for EGT employees and

MEMO OF POINTS AND  -   Page 13
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1   employees of contractors other than General; Gate 2 for General's employees; Gate 3 for railroad

2   employees; and Gate 4 for construction employees. (Ex 9, p.6).  (*See* Ex 24 for annotated

3   photograph of the site).   Initially, when EGT attempted to set up Gate 4 for the construction

4   employees, it was blocked by protestors and their cars.  Subsequently, Gate 4 was set up.  From

5   about July 18 to July 26, the protesters blocked or patrolled both the EGT gate and the General

6   gate. (Ex 9, p.6).

7          On July 21, a protester struck an EGT employee's vehicle with his hand.  (Ex 17, p. 3).  The

8   next day, on July 22, a ribbon was stretched across the entrance to Gate 1 (the EGT Gate).  One of

9   the protestors, a member of Respondent Local 4, told an EGT manager to cross the tape at his own

10  risk, and that if he did, there would be problems.  (Ex 9, p.6; Ex 11, p.3).  EGT then decided to tell its

11  employees not to come to the facility, due to what it perceived as a risky situation.  (Ex 11, p. 3;

12  Ex 12, p. 3).  Also on that day, a few hundred picketers blocked access to East Mill Road, and some

13  picketers egged an employee's car and scratched another with a key.  (Ex 12, p.3).  In addition, a

14  construction manager for T.E. Ibberson, a subcontractor performing work on the site, had his life

15  threatened.  A police officer overheard, and arrested the protester making the threat. (Ex 9, p.12; Ex

16  14, p.5).  There has been a least one additional death threat on the instant picket line.  (Ex 22C).

17         Two days later, on July 23, an employee of the same construction company had her vehicle

18  surrounded by 25 to 30 picketers as she tried to enter the EGT facility.  The protesters also blocked

19  an EGT manager's truck in, threatened to throw hot coffee on him, shouted out his home address,

20  and followed him in vehicles as he left.  (Ex 9, pp.8, 9).

21         Picketing and protests came to a zenith on July 25.  There were about 100 protesters at the

MEMO OF POINTS AND  -   Page 14                          2948 Jackson Federal Building
AUTHORITIES                                             915 Second Avenue
Civil No. _____                                    Seattle, Washington
                                                        (206) 220-6301

1   EGT gate, banging on employees' vehicles with their signs near the gate, pushing vehicles and

2   spitting on them, making verbal death threats, stating they had employees' pictures, and that they

3   knew who the employees were and would follow them home.   Bags of feces were found in the

4   parking lot inside the gate.   Respondent Local 21's Vice-President, Shelly Porter, was arrested for

5   trespass, and Vice-President Darren participated in blocking the ingress/egress.  (Ex 9, p.12; Ex 11,

6   p.4; Ex 13, pp.2, 3; Ex 18, p.3; Ex 18, p.3; Ex 19, pp.1, 2; Ex 20, p.5; Exs 22A-D, F).

7           That day, General employees were also followed onto the freeway by protesters.   Further,

8   the Local 701 shop steward quit because he feared for his safety.  After quitting, when he tried to

9   leave through the General gate (Gate 2), approximately 100 protesters stood at the gate.   Protesters

10  banged on his truck with their signs, pushed his truck, threatened him with death, and yelled

11  obscenities at him.   He was followed by protesters in two pick-up trucks who harassed him and

12  impaired his safety for miles.  (Ex 20, pp. 5, 6).

13          On or about July 28 and August 3, protesters went to General employees' home addresses.

14  (Ex 17, p.3, 4; Ex 18, p.4).  Meanwhile, as to the EGT facility itself, on about July 31, an ultra light

15  aircraft flew over the facility, and dropped a black trash bag with paper signs on it saying "scabby

16  701" in the driveway in front of the administration building.  The bag contained manure.  (Ex 14, p.5;

17  Ex 20, p.5).

18          Finally, since about August 1, protesters have placed nails on East Mill Road and in front of

19  gates 1, 2 and 4 on a daily basis.  (Ex 14, pp. 3-7).  While no one has specifically seen them drop

20  the nails, protesters have been witnessed pushing the nails with their feet so that they are standing

21  straight up.  (Ex 11, p.5; Ex 14, pp.3, 4; Ex 15, pp.3-7).

MEMO OF POINTS AND  -    Page 15                                    2948 Jackson Federal Building
AUTHORITIES                                                        915 Second Avenue
Civil No. _____                                              Seattle, Washington
                                                                  (206) 220-6301

1    The protesters continue at the EGT site 24 hours a day. (Ex 9, p.14).  General employees

2    have missed several days of work due to safety concerns.  BNSF will not deliver to EGT unless it

3    has a formal security plan in place, and assesses EGT a penalty demurrage when it cannot unload

4    its train.  (Ex 9, p.5; Ex 16A, B).  The Longview Police Department and the Cowlitz County Sheriff's

5    office have informed EGT that they do not have the staff to control the picketers.  The Sheriff has

6    sworn an affidavit verifying as much. (Ex 23).  While Respondents agreed during a meeting with the

7    Sherriff's office on July 26 to limit the number of picketers to 16 at the EGT gates, it has declined to

8    provide assurances to BNSF officials that picketers/protestors will refrain from going onto the tracks.

9    To date, it appears that the number of picketers has been limited to approximately 16 at the gates,

10   but additional picketers are set up on East Mill Road.  (Ex 11, p.4; Ex 13, p.3; Ex 14, p.2).

11   IV.    Injunctive Relief is Just and Proper

12         As discussed above, the Ninth Circuit has articulated a just and proper test that requires

13   consideration of four equitable factors: (1) the likelihood of success on the merits; (2) consideration

14   of irreparable injury; (3) the extent to which the balance of hardships favors each party; and (4)

15   whether the public interest will be advanced by granting the preliminary relief.  *Frankl v. HTH Corp.*, -

16   -- F.3d ---, 2011 WL 2725812, at *15 (9th Cir. 2011); *Miller,* 19 F.3d at 459-60l; *Small v. Operative*

17   *Plasters',* 611 F.3d at 483; **Error! Bookmark not defined.***Overstreet,* 409 F.3d at 1199.

18         A.    Petitioner Can Demonstrate A Strong Likelihood of Success on the Merits

19         The evidence described above demonstrates that Respondents have engaged in extensive

20   picketing and other coercive conduct directed against EGT.  As shown below, there is a strong

21   likelihood that Petitioner can successfully demonstrate that such coercive conduct violates Sections

MEMO OF POINTS AND  -    Page 16
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1  8(b)(4)(i) and (ii)(A), (B) and Section 8b(1)(A) of the Act [29 U.S.C. §§ 158(b)(4)(i)(ii)(A), (B) and

2  158b(1)(A)].

3          1.      Applicable Principles

4      Sections 8(b)(4)(i) and (ii)(A) and (B) of the Act [29 U.S.C. §§158(b)(4)(i) and (ii)(B)],

5              make it an unfair labor practice for a union "(i) to engage in, or to induce or
6              encourage . . ., a strike or a refusal . . . to perform any services; or (ii) to threaten,
7              coerce, or restrain any person engaged in commerce or in an industry affecting
8              commerce, where . . . an object thereof is:
9
10             (A) forcing or requiring any employer . . . to enter into any
11             agreement which is prohibited by section 8(e);
12
13             (B) forcing or requiring any person to cease . . . doing business with any other
14             person . . . .

15  Conduct that falls under the ambit of Section 8(b)(4)(i) includes every form of influence or

16  persuasion." *IBEW Local 501 v. NLRB*, 341 U.S. 694 (1951).  The restraint or coercion proscribed

17  by Section 8(b)(4)(ii) extends not only to strikes and picketing, but also to "any form of economic

18  pressure of a compelling or restraining nature." *Associated Gen. Contractors of CA v. NLRB,* 514

19  F.2d 433, 438 (9th Cir. 1975).

20      A union violates Section 8(b)(4) if it threatens or coerces with an unlawful object; it does not

21  matter that the unlawful object is not Respondent's sole object.  *NLRB v. Denver Building and*

22  *Construction Trades Council,* 341 U.S. 675, 689 (1951).  *Accord NLRB v. Musicians Union, AFM*

23  *Local 6,* 960 F.2d 842, 845 (9th Cir. 1992).  In determining whether Respondent has an unlawful

24  object under Section 8(b)(4), the inquiry "is often an inferential and fact-based one, at times requiring

25  the drawing of lines 'more nice than obvious.'" *NLRB v. Longshoremen,* 473 U.S. 61, 81 (1985),

26  *quoting Electrical Workers v. NLRB,* 366 U.S. 667, 674 (1961).  The determination often involves

MEMO OF POINTS AND  -    Page 17
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1   drawing a "commonsense inference" from the facts.  *NLRB v. Pipefitters*, 429 U.S. 507, 531 (1977).

2           Section 8(b)(4)(A) specifically prohibits a union from coercing an employer to enter into an

3   agreement prohibited by Section 8(e).[7]  *Iron Workers Dist. Council, Local 29 v. NLRB,*  913 F.2d

4   1470, 1473 (9th Cir. 1990).  The statutory prohibition against coercing an employer to "enter into" an

5   8(e) agreement also prohibits attempts to force an employer to maintain, enforce, or reaffirm such

6   agreements.  *See, e.g., Local 812, International Brotherhood of Teamsters v. NLRB,* 947 F.2d 1034,

7   1040 (2d Cir. 1991); *Painters Orange Belt District Council 48,* 276 NLRB 1372, 1385-86 (1985).

8           Section 8(b)(4)(B) prohibits secondary boycott activities, which are those activities

9   "calculated to involve neutral employers and employees in Respondent's dispute with the primary

10  employer."  *Iron Workers Dist. Council, Local 29,* 913 F.2d at 1475.  *Accord NLRB v. General Truck*

11  *Drivers,* 20 F.3d 1017 (9th Cir. 1994).  The "secondary boycott provisions of the Act reflect 'the dual

12  congressional objective of preserving the right of labor organizations to bring pressure to bear on

13  offending employers in primary labor disputes and of shielding unoffending employers and others

14  from pressures in controversies not their own.'"  *General Truck Drivers,* 20 F.3d 1024, *quoting NLRB*

15  *v. Denver Bldg. and Const. Trades Council,* 341 U.S. 675, 692 (1951).

16              2.       **Respondents' Conduct Constitutes Threats and**
17                       **Coercion Pursuant to Section 8(b)(4)(i)(ii)**

18          There is no dispute that Respondents engaged in conduct covered by Section 8(b)(4)(i)(ii).

19  After EGT made it clear that it would not employ individuals hired out of Respondent Local 21's hall,

20  Respondents' members and officials engaged in coercive activities designed to induce employees

---

[7]  Section 8(e) [29 U.S.C. § 158(e)] provides, in pertinent part, that "[i]t shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease . . .doing business with any other person . . . ."

MEMO OF POINTS AND   -   Page 18          2948 Jackson Federal Building
AUTHORITIES                              915 Second Avenue
Civil No. _____                     Seattle, Washington
                                         (206) 220-6301

1    from performing their duties.  For example, Respondents' picketers and protestors effectively

2    surrounded and blocked a 107-car train of BNSF that was delivering product to EGT to induce

3    BNSF's employees from performing their duties.  The coercive activities were so effective that

4    BNSF's employees were not only induced to cease performing their duties that day, but ever since

5    that time due to concerns over renewed violence.  Similar actions have also been taken against EGT

6    and General Construction in order to accomplish the same goal.

7        First, as to actions directed against EGT employees, carloads of Respondents' picketers

8    also induced EGT's employees not to come to work because they believed it was too dangerous,

9    particularly after picketers threatened EGT's Operations Manager, Brad Hansen, that there would be

10    problems if he crossed the tape that was stretched across the gate set up for EGT's employees.

11    Further, after General Construction signed a contract with EGT, picketers threatened both EGT and

12    General Construction employees and carried signs labeling them as scabs in an effort to discourage

13    the General Construction employees from working.  Furthermore, Respondent's ongoing picketing is

14    exactly the type of restraint that Section 8(b)(4)(ii) is designed to address.

15                **3.**      **Respondents' Conduct Violates 8(b)(4)(A)**

16                        **a.**       **An Object of Respondents' Conduct is to Force EGT**
17                             **to Abide by the Terms of the Working Agreement**

18        As described above, the evidence also demonstrates that Respondents engaged in the

19    picketing and other coercive activities to force EGT to adopt Respondent Local 21's contractual

20    requirement to use Respondent Local 21's employees.  After construction of EGT's facility was

21    completed, Respondent Local 21 approached EGT in unsuccessful attempts to force EGT to adopt

22    the terms of its Working Agreement with the Port.  Respondent Local 21's president informed EGT

MEMO OF POINTS AND  -     Page 19                             2948 Jackson Federal Building
AUTHORITIES                                               915 Second Avenue
Civil No. _____                                  Seattle, Washington
                                                       (206) 220-6301

1   official Gibson that it was claiming the disputed work, which included the unloading of the rail cars

2   and the loading and unloading of grain from ships.  After EGT informed Coffman that it disagreed

3   that it was obligated to have the work performed by Respondent 21's members, mass picketing,

4   property damage, blocking of ingress and egress and other extensive coercive activities immediately

5   ensued.  Respondents' picket signs stated that the work being performed was ILWU work and that it

6   was being performed within ILWU's jurisdiction.  Once General's employees began performing the

7   disputed work, the picket signs identified those employees as scabs because they were taking away

8   Respondents' work.

9          The basis for Respondent Local 21's claim that it is entitled to perform the work is based on

10  the Working Agreement.  Thus, Respondent Local 21 asserts that by entering into a lease that

11  "refers to" the Working Agreement, EGT became bound to the jurisdictional provisions requiring that

12  the work be performed by Respondent Local 21 members.  As EGT steadfastly insisted that it never

13  agreed to be bound to the provisions of that Working Agreement, Respondent has picketed in an

14  effort to force EGT to adopt and abide by those contractual provisions.

15         Accordingly, the evidence establishes that Petitioner has a high likelihood of success

16  showing that an object of Respondents picketing is to force EGT to abide by the provisions of the

17  Working Agreement and hire Respondent Local 21's members.

18              b.      The Subcontracting and Lease Clauses of
19                      the Working Agreement Violate Section 8(e)

20         As the Supreme Court explained in *National Woodwork Mfrs Assn. v. NLRB*, 386 U.S. 612,

21  633-34 (1967), Section 8(e) was designed to supplement and reinforce the existing prohibitions

22  against secondary boycotts under the Act by prohibiting "voluntary" agreements to engage in

MEMO OF POINTS AND -    Page 20                     2948 Jackson Federal Building
AUTHORITIES                                          915 Second Avenue
Civil No. _____                                 Seattle, Washington
                                                     (206) 220-6301

1  secondary boycotts.  Accordingly, Section 8(e), like Section 8(b)(4)(B), reaches only secondary

2  activity.  In distinguishing a lawful primary agreement from a prohibited secondary one, "the

3  touchstone is whether the agreement or its maintenance is addressed to the labor relations of the

4  contracting employer *vis-a-vis* his own employees" or whether the agreement is "tactically calculated

5  to satisfy union objectives elsewhere." *National Woodwork*, 386 U.S. at 644-645.  *See also Pacific*

6  *Northwest Chapter v. NLRB*, 654 F.2d 1301 (9th Cir. 1981), *affd. In part, vacated in part, sub nom.*

7  *Woelke & Romero Framing Co. v. NLRB*,456 U.S. 645 (1982); *NLRB v. Hotel & Restaurant*

8  *Employees Bartenders Union Local 531*, 623 F.2d 61, 65-66 (9th Cir. 1980)

9          An employer's agreement to cease doing business with another employer[8] does not violate

10  Section 8(e) where it relates to the working conditions of employees.  *National Woodwork*, 386 U.S.

11  at 645-46 (contract clause that restricts performance of fairly claimable work to unit members

12  employed by the employer is primary).  *See also Teamsters Local 251 (Material Sand & Stone*

13  *Corp.),* 356 NLRB No. 135, slip op. at 2 (2011) (agreement that an employer will not subcontract

14  work performed by bargaining unit employees to any person serves lawful primary purpose of

15  preserving work for unit employees and agreement that permits employer to subcontract work only

16  to subcontractors that honor the economic terms of the collective-bargaining agreement serves a

17  lawful primary purpose of eliminating an economic incentive to remove work from unit employees).

18  By contrast, where the agreement to cease doing business is designed "not to protect or to preserve

19  the jobs and working conditions of employees in the unit, but to control the employment practices of

20  other employers . . and to aid union members generally[,]" the clause is secondary and violative of

---

[8]  The term "cease doing business" includes disruptions and changes in the method of doing business short of a total
cessation of business.  *See, e.g., NLRB v. Operating Engineers, Local 825 (Burns & Roe),* 400 U.S. 297, 304-305

MEMO OF POINTS AND  -   Page 21
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1    Section 8(e).  *Retail Clerks Local Union No. 1288 (Nickel's Pay-Less Stores),* 163 NLRB 817, 820,

2    *enf'd. in pertinent part,* 390.2d 858, 861-62 (D.C. Cir. 1968).

3              An agreement requiring an employer to cease doing business violates Section 8(e) where it

4    is asserted against an employer with whom Respondent has no collective-bargaining relationship

5    cannot purport to protect the interests of employees in a contractual unit, but "is unquestionably for

6    the purpose of achieving union objectives elsewhere." *Colorado Building and Constructions Trades*

7    *Council,* 239 NLRB 253, 255 n. 8 (1978).  However, a union can also violate Section 8(e) by an

8    agreement that is negotiated in the context of a collective-bargaining relationship.  That occurs

9    where the agreement requires the employer to do business only with employers who agree to be

10   bound to all of the terms of a respondent union's contract.  *See, e.g., NLRB v. Hotel & Restaurant*

11   *Employees & Bartenders' Union Local 531,* 623 F.2d 61 (9th Cir. 1980) (contractual provision that

12   requires employer to subcontract or lease only to entities who are bound to Respondent agreement

13   violates Section 8(e)); *Iron Workers (Southwestern Materials),* 328 NLRB 934, 936 (1999)

14   (contractual clause that prohibits signatory employer from subcontracting work within Respondent's

15   jurisdiction to any person or entity that does not have a contract with Respondent violates Section

16   8(e) because it does not have a primary work preservation objective).

17             Applying the above principles, the contractual clause of the Working Agreement that

18   Respondent Local 21 seeks to enforce against EGT to justify its claim to the work clearly violates

19   Section 8(e).  The subcontracting clause prohibits the employer from subcontracting work that falls

20   within Respondent Local 21's jurisdiction to any companies "unless such companies are bound by

---

(1971); *Associated General Contractors of California, Inc. v. NLRB,* 514 F.2d 433, 437 n. 6 (9th Cir. 1975).

MEMO OF POINTS AND  -   Page 22            2948 Jackson Federal Building
AUTHORITIES                                915 Second Avenue
Civil No. _____                       Seattle, Washington
                                           (206) 220-6301

1    this Agreement."  The lease clause prohibits the lease of property to perform work that falls within

2    Respondent Local 21's jurisdiction "unless the lessee is bound by this Agreement."  These clauses

3    are classic union signatory clauses prohibited by Section 8(e) because they focus on union affiliation

4    by prohibiting an employer from subcontracting or leasing to any employer not signatory or approved

5    by Respondent.  As the Ninth Circuit has recognized, such "clauses requiring such affiliation or

6    approval are directed at more than work preservation they are . . .viewed as an effort to expand

7    Respondent's sphere of influence by impermissible secondary pressure."  *Hotel & Restaurant*

8    *Employees & Bartenders' Union Local 531,* 623 F.2d at 67.

9           Contrary to Respondents' anticipated contention, the clauses do not have a primary work

10   preservation objective because they do not bar all subcontracting of, or the leasing of property to

11   perform, its members' work.  Rather, the fact that the clauses permit subcontracting or leases to

12   union signatories belies any asserted work preservation objective. *Id.; Teamsters Local 251*

13   *(Material Sand & Stone Corp.),* 356 NLRB No. 135, slip op. at 3 (2011); *Chemical Workers Local 6-*

14   *18 (Wisconsin Gas Co.),* 290 NLRB 1155, 1155-56 (1988).  Furthermore, the clauses do not have

15   lawful primary purpose of eliminating any economic incentive to remove work from unit employees.

16   They do not simply require the subcontractor or lessee to observe the economic standards (*i.e.,*

17   wages and benefits) set by Respondent Local 21; they require that the subcontractor or lessee are

18   bound to all provisions of the agreement.  *Hotel & Restaurant Employees & Bartenders' Union Local*

19   *531,* 623 F.2d at 67; *Teamsters Local 251 (Material Sand & Stone Corp.),* 356 NLRB No. 135, slip

20   op. at 3 (2011).

21          There can be no merit to Respondent's prospective argument that it did not violate Section

MEMO OF POINTS AND  -   Page 23
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1   8(b)(4)(A) because the Working Agreement between the Port and Respondent does not violate a

2   Section 8(e) agreement because the Port is not a statutory employer.  Although it is true that

3   Respondent Local 21 and the Port did not violate Section 8(e) when they entered into the Working

4   Agreement because the Port is not an employer under the Act, Respondent's picketing and other

5   coercive activities are not directed at the Port to reaffirm the Working Agreement with Respondent

6   Local 21.  Rather, Respondents' coercive activities seek to force *EGT*, who is a statutory employer,

7   to affirm or adopt the Working Agreement's secondary provisions proscribed by Section 8(e).

8        In sum, the evidence demonstrates Respondents picketed and engaged in other coercive

9   activities with an objective of forcing EGT to enter into an agreement that contains clauses that

10  violate Section 8(e).  Such conduct, therefore, violates Section 8(b)(4)(i) and (ii)(A).

11            **4.    Respondents' Conduct Violates Section 8(b)(4)(B)**
12                 **Because An Object of Its Conduct Was to Force**
13                 **EGT to Cease Doing Business with General**

14       The evidence further demonstrates that once EGT subcontracted the production and

15  maintenance work to General, Respondents engaged in mass picketing and other coercive conduct,

16  and continue to engage in picketing, directed at EGT.  As this conduct had and has a proscribed

17  secondary objective, it violates Section 8(b)(4)(B).

18       Although Respondent Local 21's initial dispute was with EGT to force EGT to be bound to

19  the Working Agreement, once EGT entered into a contract with General, the object of the picketing

20  expanded.  Now General and its employees were to perform the dock work that Respondent 21

21  sought for its members.  Instead of adopting the Working Agreement and recognizing Respondent

22  Local 21, however, General voluntarily recognized another labor organization. Respondents' primary

MEMO OF POINTS AND  -   Page 24
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

dispute now included General and its picket signs labeled General's employees as "scabs" because they were performing "Respondent Local 21's work" and Respondent's president, Coffman, accused that union of stealing Respondent Local 21's work.

Respondents, nevertheless also continued to direct their picketing towards EGT.  EGT, however, does not have any employees that perform the work that falls under the Working Agreement..  Thus, its picketing cannot be directed to the labor relations of EGT "*vis-a-vis* his own employees."  *National Woodwork*, 386 U.S. at 644-45.  That is, EGT cannot recognize Respondent Local 21 as its employees' bargaining representative because its employees do not perform the work that Respondent Local 21 claims.

Rather, Respondents' coercive conduct directed towards EGT is "tactically calculated to satisfy union objectives elsewhere."  *Id.*  Here, the logical inference to be drawn is that Respondents' coercion of EGT, which subcontracted the work that Respondent Local 21 claims, has an objective of forcing EGT to cease doing business with General.  In that way, EGT can replace General with another subcontractor who will employ Respondent Local 21 members.  Or, Respondents' coercion may be designed to force EGT to threaten to cease doing business with General unless General agrees to use Respondent Local 21 members.  *See, e.g., Hotel & Restaurant Employees Local 531 (Verdugo Hills Bowl),* 237 NLRB 1204 (1978), *enfd.,* 623 F.2d 61 (9th Cir. 1980)(union's conduct had objective proscribed by 8(b)(4)(B) where employer bowling alley could meet union's demands only by breaking its lease with lessee with which union had primary dispute or forcing lessee to change its practices with respect to union).  In either case, however, Respondents' coercion has a proscribed secondary objective of coercing one employer—EGT—to

MEMO OF POINTS AND  -    Page 25
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1   satisfy its objectives with the employer with which Respondent Local 21 now has its primary dispute-

2   - General.

3         Accordingly, the evidence establishes that Petitioner has a strong likelihood of success on

4   the merits of establishing Respondents' picketing directed at EGT has a secondary objective of

5   forcing EGT to cease doing business with General.  Thus, Respondents' conduct violates Section

6   8(b)(4)(B).

7              **5.**      **Respondents 21 and 4 violated Section 8(b)(1)(A) of the Act**

8         The picketers' and protesters' actions reasonably tended to coerce employees in the

9   exercise of their Section 7 rights [29 U.S.C. § 157].  As discussed in detail *supra,* the factual

10  evidence clearly establishes that the picketers and protesters engaged in serious misconduct such

11  as mass picketing, death threats, property damage, blocking of ingress and egress, placing nails in

12  the road, interfering with a rail carrier, acts of physical misconduct and menacing, and following

13  employees, among other acts.  *See Carpenters Local 209 (C.E. Wylie Construction)*, 304 NLRB

14  1098, 1100 (1991), *enfd.*, 1 F.3d 1247 (9th Cir 1993) (misconduct by picketers is "violative of Section

15  8(b)(1)(A) of the Act, as such conduct restrains and coerces employees in the exercise of their

16  Section 7 rights to elect to engage in or refrain from engaging in union activity without fear of

17  repercussions from a union").  There can be no good faith dispute that Respondent Locals 21 and 4,

18  by their officers' and/or agents' very presence and frequent participation, ratified and condoned the

19  misconduct.  Their officers were present on almost a daily basis and were clearly aware on the

20  ongoing campaign of misconduct, but they failed to either disavow the incidents or police the picket

21  line.  *NLRB v. Bulletin Co.,* 443 F. 2d 863, 865-67 (3rd Cir 1971).

MEMO OF POINTS AND   -   Page 26
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1
2

      **6.**      **Respondent 4 is Jointly Responsible for**
                     **Respondent 21's Unlawful Conduct**

3       A union is held accountable for the conduct of others where the Respondent "instigated,

4  authorized, solicited, ratified, condoned, or adopted" the statements and unlawful conduct. *Iron*

5  *Workers Dist. Council, Local 29,* 913 F.2d 1470, 1477 (9th Cir. 1990), *quoting NLRB v. Miramar of*

6  *Cal., Inc.,* 601 F.2d 422, 425 (9th Cir. 1979).

7       While Respondent Local 21 was involved in the initial dispute with EGT over the lease with

8  the Port and subsequent negotiations, once the picketing started in June 2011, Respondent Local 4

9  became fully involved.  Respondent Local 4 had a frequent official presence at the protests and

10  pickets.  Respondent Local 4's president was arrested at one of the demonstrations and he was

11  present at the picket lines on a regular basis.  Respondent Local 4 members picketed frequently with

12  signs identifying them as Local 4 and supporting the dispute with EGT.  Respondent Local 4 clearly

13  ratified and condoned the actions of Respondent Local 21; indeed, it was one in solidarity with its

14  sister Local in the conduct of the picket line in furtherance of the unlawful objectives.

15     **B.**     **Irreparable Injury Will Occur Absent Sections 10(l) and 10(j) Relief**

16       There is a serious likelihood of irreparable harm if injunctive relief is not granted—in fact,

17  irreparable harm has already occurred. In evaluating whether irreparable injury to the policies of the

18  Act is threatened, as well as in balancing the hardships, the district court must "take into account the

19  probability that declining to issue the injunction will permit the allegedly unfair labor practice to reach

20  fruition and thereby render meaningless the Board's remedial authority." *Miller,* 19 F.3d at 460, citing

21  *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545 (1987); *Scott v. Stephen Dunn &*

22  *Associates,* 241 F.3d 652, at 667-68, 669 (9th Cir. 2001).

MEMO OF POINTS AND -   Page 27
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1    First, absent injunctive relief, the Respondents' actions threaten to inflict irreparable harm on

2    the employees' Section 7 right to refrain from Union activity.[9]   Picket line violence will inevitably

3    cause EGT and General employees to abstain from working more than they already had to, and

4    General employees have already missed several days of work due to safety concerns.[10]   As such,

5    they have lost wages in a form the Board cannot remedy.[11]

6    In addition, the employees' abstention could seriously harm EGT's and General's business

7    operation and impede commerce.[12]   In fact, the actions of Respondents have already completely

8    disrupted commerce.  Burlington Northern Santa Fe railroad has refused to make deliveries of large

9    quantities of grain; EGT has lost business to competitors and potentially incurred substantial

10   monetary losses and can incur ongoing demurrage charges for the failure to unload railroad cars.

11   Moreover, a $200,000,000 facility is being left idle.

12   Given the factual history of this case, there is a substantial likelihood that Respondent will

13   engage in proscribed conduct when another train attempts to deliver grain to the EGT facility.  Even

14   though there has been a temporary diminishment in the numbers involved in the mass picketing,

15   making it more limited at present, there are clear indicators that Respondents will again engage in

---

[9] *See Price v. Laborers Local 383*, 108 L.R.R.M. (BNA) 3270, 3271-73 (D. Ariz. 1981), *affd.* 679 F.2d 900 (9th Cir. 1982) (table); *Frye v. District 1199*, 996 F.2d 141, 144 (6th Cir. 1993), citing *Union Nacional de Trabajadores*, 219 NLRB 414 (1975), *enfd.* 540 F.2d 1 (1st Cir. 1976); *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 744 (7th Cir. 1976); *Kollar v. United Steelworkers of America, Local 2155*, 161 L.R.R.M. (BNA) 2307 (N.D. Ohio 1999); *Grupp v. United Steelworkers of America*, 532 F. Supp. 102 (W.D. Pa. 1982); *Compton v. Puerto Rico Newspaper Guild*, 343 F. Supp. 884 (D. P.R. 1972); *Vincent v. Local 301, IUE*, 73 L.R.R.M. (BNA) 2136 (N.D.N.Y. 1969).
[10] *See Bloedorn v. Teamsters Local 695*, 132 L.R.R.M. (BNA) 3102, 3108 (W.D. Wisc. 1989); *Price v. Laborers Local 383*, 108 (BNA) at 3271-73.
[11] *See Union Nacional de Trabajadores*, 219 NLRB at 414 (employees illegally coerced by union into joining strike not entitled to backpay: Board suggests use of Section 10(j) relief).
[12] *See, e.g., Danielson v. Laborers, Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973); *Wilson v. Milk Drivers and Dairy Employees Local 471*, 491 F.2d 200, 206 (8th Cir. 1974)(threat of financial harm to employer's operations warranted injunctive relief against unions' NLRA misconduct to restore status quo).

MEMO OF POINTS AND  -    Page 28
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1  proscribed conduct given that Respondents are continuing to place masonry nails at the entrances

2  to the gates leading into the EGT facility and verbally assault those trying to enter.  There is no

3  reason to believe the proscribed conduct will abate, as Respondents have failed to give any

4  assurances thus far.  Moreover, Respondents' conduct with the last railroad delivery attempt

5  indicates that this dispute is far from over and, in fact, will be repeated should another delivery be

6  attempted.  In sum, the threat of further unlawful conduct and property damage is also very real.[13]

7          Finally, local law enforcement officials have sworn that they do not have the resources to

8  control mass protests and picketing such as those occurring in this situation.[14]  The Unions'

9  apparent agreement to limit the number of picketers at the gates does nothing to alleviate this threat.

10  Ultimately, the illegal campaign may force EGT and General to capitulate to the Unions' demands.

11  The Board's final order will not effectively remedy these harms.  Thus, the evidence overwhelmingly

12  establishes that there will be irreparable harm and interference with commerce if injunctive relief is

13  not granted.

14          C.          The Balance of Hardships Favors Injunctive Relief

15          A balancing of the hardships among the parties clearly favors the imposition of the

16  requested injunctive relief.  Respondents would not be unduly impacted by the injunction, which

17  would simply require that Respondent abide by the long-standing provisions of Sections 8(b)(1)(A)

18  and  8(b)(4)(i) and (ii)(A) and (B) of the Act while they pursue their alleged disputes with EGT and

---

[13] *See Grupp v. United Steelworkers of America*, 532 F. Supp. at 105 (injunctive relief warranted where misconduct which presented "danger of personal injury and property damage to strikers, non-striking employees, and third parties" was continuing).

[14] *See Shore v. Building & Construction Trades Council*, 173 F.2d 678, 682 (3d Cir. 1949) ("It is clear as a general proposition of equity that the granting of an injunction is not foreclosed because the act feared has already happened, if

MEMO OF POINTS AND  -    Page 29
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

1  General in any lawful manner.  The injunction would not require Respondents to cease any legal

2  efforts to resolve the dispute.

3       A continuation of the unlawful conduct would only expose the other parties, EGF, General

4  and its employees to continuing economic burdens and keep their affiliates and employees in

5  constant fear for their own safety.  The underlying dispute concerns Respondent Local 21's demand

6  for positions at EGT's facility.  The positions will be there for the foreseeable and long term future.

7  Thus, in short, Respondents suffer no hardships from the granting of an injunction which requires

8  them to obey the law.

9       D.     The Public Interest Favors Injunctive Relief

10       The public interest will be advanced by the granting of injunctive relief in this case.  First and

11  foremost, the Act protects against the precise unlawful interference with interstate commerce that

12  Respondents' actions are causing.   By obtaining an injunction against Respondent's unlawful

13  actions the Board will have maintained the integrity of the Act, as "the public interest is to ensure that

14  an unfair labor practice will not succeed because the Board takes too long to investigate and

15  adjudicate the charge."  *Scott v. Stephen Dunn & Associates,* 241 F.3d at 657, *quoting Miller v.*

16  *California Pacific,* 19 F.3d at 460.  Finally, the passage of Section 8(b)(4)(i) and (ii)(A) and (B) of the

17  Act is itself an implied finding by Congress that violations of that Section of the Act will in and of

18  themselves harm the public.   *Miller* at 460.   A temporary restraining order is appropriate in the

19  interim to protect the public interest.  *Squillacote v. Meat & Allied Food Workers Local 248*, 534 F.2d

20  735 (7th Cir. 1976).

---

there is reasonable grounds for believing that it will be done again"); *Kobell v. United Paperworkers Int'l Union,* 965 F.2d
1401, 1410-1411 (6th Cir. 1992)(10(j) case not moot because "the alleged unfair labor practice could recur").

MEMO OF POINTS AND  -   Page 30
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301

## V.      Conclusion

In sum, the evidence shows that Petitioner has reasonable cause to believe that Respondents have engaged in and are engaging in conduct that violates Sections 8(b)(1)(A) and 8(b)(4)(i) and (ii)(A) and (B) of the Act.  Application of the four equitable factors as set forth in *Frankl* and *Overstreet*, demonstrates that it is just and proper to grant the injunctive relief sought. Accordingly, it is respectfully requested that the Court grant the injunctive relief prayed for in the Petition.

DATED AT Seattle, Washington, this 31st day of August, 2011.

/s/ Anne Pomerantz,
/s/ Daniel Sanders
/s/ John Fawley
/s/ Helena Fiorianti
Anne Pomerantz,  CA Bar 204059; NY Bar 2398428
Daniel Sanders, WA Bar 3679
John Fawley,  MA Bar 160410
Helena Fiorianti, NJ Bar 2006-00127; NY Bar 4442786
National Labor Relations Board
915 2nd Ave, Suite 2948
Seattle, WA 98174
Telephone (206) 220-6301
Fax: (206) 220-6305
Email: Anne.Pomerantz@nlrb.gov
        Daniel.Sanders@nlrb.gov
        John.Fawley@nlrb.gov
        Helena.Fiorianti@nlrb.gov
Counsel for Petitioner

MEMO OF POINTS AND  -    Page 31
AUTHORITIES
Civil No. _____

2948 Jackson Federal Building
915 Second Avenue
Seattle, Washington
(206) 220-6301