1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RICHARD L. AHEARN, Regional Director of
the Nineteenth Region of the National Labor
Relations Board, for and on behalf of the
NATIONAL LABOR RELATIONS BOARD,

                                   Petitioner,

        v.

INTERNATIONAL LONGSHORE and
WAREHOUSE UNION, LOCAL 21,

                                   Respondent,

And

INTERNATIONAL LONGSHORE and
WAREHOUSE UNION, LOCAL 4,

                                   Respondents.

No.  3:11-CV-05684-RBL

**RESPONDENTS' OPPOSITION
TO PETITION FOR PRELIMINARY
INJUNCTION**

Hearing:  September 8, 2011
Time:       1:30 p.m.
Place:      Courtroom B
               Judge Leighton

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1

## TABLE OF AUTHORITIES

2

*Cases*

3

*Bantam Books Inc. v. Sullivan,*

372 U.S. 58 (1961).........................................................................................12

*Brewery Workers Local 8 (Bert P. Williams, Inc.),*

148 NLRB 728 (1964) ...................................................................................21

*Chipman Freight Services v. NLRB,*

843 F.2d 1244, 1226 (9th 1988).....................................................................17

*Dahl v. HEM Pharmaceuticals, Inc.,*

7 F.3d 1399 (9th Cir. 1993) ...........................................................................11

*Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union,*

494 F.2d 1230 (2d Cir.1974)..........................................................................12

*Edward J. Debartolo Corp. v. NLRB,*

463 U.S. 147, 103 S.Ct. 2926 , 77 L.Ed.2d 535 (1983)..................................18

*Fibreboard Corp. v. NLRB,*

379 U.S. 203 (1964)........................................................................................20

*Freight, Construction, General Drivers Union, Local 287 (Buck's Butane – Propane Service, Inc.,*

), 186 NLRB 187 (1970)...........................................................................19, 21

id. at 623, 87 S.Ct..................................................................................17, 18

*International Longshoremen's Association, AFL-CIO v. Allied International, Inc.,*

456 U.S. 212, 102 S.Ct. 1656 , 72 L.Ed.2d 21 (1982)................................18, 21

*Int'l Union of Automobile Workers of Am. v. O'Brien,*

339 U.S. 454 (1950)........................................................................................19

*Marlyn Neutraceuticals v. Mucos Pharma Gmbh & Co.,*

571 F.3d 873 (9th Cir. 2009) .........................................................................11

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

TABLE OF CONTENTS
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

*National Labor Relations Board v. Fruit and Vegetable Packers and Warehousemen, Local 760,*

377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) .................................................... 16, 17

*New York Electrical Contractors Ass'n,*

244 NLRB 357 (1979) ................................................................................................ 2, 13

*NLRB v. Denver Bldg. & Constr. Trades Council,*

341 U.S. 675, 71 S.Ct. 943 , 95 L.Ed. 1284 (1951) .................................................... 15, 16

*NLRB v. Int'l Rice Milling Co.,*

341 U.S. 665 (1951) ...................................................................................................... 19

*NLRB v. Local 825, Int'l Union of Operating Engineers,*

400 U.S. 297 (1971) ................................................................................................. 19, 21

*Overstreet v. Carpenters Local 1506,*

409 F.3d 1199 (9th Cir. 2005) ............................................................................ 11, 12, 17

*Production Workers Local 707 v. NLRB,*

793 F.2d 323 (D.C.Cir.1986) ................................................... 12, 13, 15, 16, 17, 18

*Schneider v. New Jersey,*

308 U.S. 147 (1939) ...................................................................................................... 12

*Thomas v. Collins,*

323 U.S. 516 (1945) ...................................................................................................... 12

*Thornhill v. Alabama,*

310 U.S. 88 (1940) .................................................................................................. 11, 12

*Statutes*

29 U.S.C. § 151 ............................................................................................................. 14

29 U.S.C. § 158(b)(4)(A) ................................................................................................ 2

29 U.S.C. § 158(b)(4)(B) ................................................................................................ 1

29 U.S.C. § 158(e) .......................................................................................................... 2

29 U.S.C. § 160(l) ........................................................................................................... 1

TABLE OF CONTENTS
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1

**Table of Contents**

2

INTRODUCTION ................................................................................................. 1

3

FACTS ................................................................................................................... 2

4

ARGUMENT ........................................................................................................ 10

5

6

    A.    The Petition Improperly Proposes Restraint on Free Speech and A "Mandatory" Injunction, Which the Courts Disfavor. .................................................... 10

7

    B.    There Is No 8(B)(4)(A) Violation, As A Matter Of Law, Because There Is No Violation Of Section 8(e), Which Is The Statutory Predicate. .................................. 13

8

9

    C.    The Undisputed Facts Show There Is No 8(b)(4)(B) Violation ................................ 14

10

      1.    Section 8(b)(4)(B) Protects Picketing against a Party Who is Not "Neutral" Nor "Wholly Unconcerned" in the Labor Dispute ................................................ 14

11

12

      2.    EGT is Not a Neutral and Therefore Is A Lawful Target of Picketing ................... 18

13

      3.    The Undisputed Evidence Shows That Local 21 Has a Lawful Labor Dispute With EGT ................................................................................................ 21

14

15

    D.    The Record Does Not Warrant an Injunction under § 10(j) as to Picketing "Misconduct" ........................................................................................... 23

16

CONCLUSION ..................................................................................................... 24

17

18

19

20

21

22

23

24

25

26

TABLE OF CONTENTS
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1

## <u>INTRODUCTION</u>

2

The Petition for Preliminary Injunction, filed by the Regional Director for Region 19

3

of the National Labor Relations Board (NLRB), seeks to ban all peaceful, labor picketing by

4

Respondents ILWU Local 21 and ILWU Local 4, under Section 10(l) of the Labor

5

Management Relations Act (LMRA or Act), 29 U.S.C. § 160(l), and, in the alternative, to

6

7

restrain various picket line "misconduct" (e.g., physical blocking of cars and trains, trespass,

8

threats of violence *etc*.) under Section 10(j) of the Act. The picketing commenced in early

9

July, 2011, at the new EGT grain elevator facility in the Port of Longview, WA., after EGT,

10

LCC, broke off collective bargaining negotiations with ILWU Local 21 and refused to

11

employ Local 21 longshoremen in violation of the terms of its Lease with the Port, which

12

requires EGT to employ Local 21 longshoremen under the Port's Working Agreement with

13

14

Local 21.[1]

15

As detailed below, the picketing is lawful, primary picketing directed solely at EGT

16

and protected under the First Amendment to the U.S. Constitution. EGT is a lawful target for

17

picketing because it is not in any way a "neutral" or "wholly unconcerned" in this labor

18

dispute within the meaning of Section 8(b)(4)(B) of the Act, 29 U.S.C. § 158(b)(4)(B). The

19

company lost any pretense of "neutrality" in the labor dispute through its voluntary actions in

20

21

signing the Port Lease, containing provisions for the employment of Local 21 longshoremen,

22

and in engaging in extensive collective-bargaining with Local 21 over a period of many

23

months before picketing commenced.

24

---

[1] On about January 12, 2011, EGT filed a declaratory relief action against the Port of Longview in *EGT, LCC v. Port of Longview*, Case No. 3-11-cv-05036-RBL, seeking a determination whether the terms of its Port Lease obligates it to employ Local 21 longshoremen under a collective bargaining agreement with Local 21.  The Port has a filed a motion for partial summary judgment, arguing that the Port Lease does impose such obligations as was the specific, mutual intent of the leasing parties.

25

26

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 1
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

Nor does the picketing violate section 8(b)(4)(A), 29 U.S.C. § 158(b)(4)(A), because the Port's Working Agreement with Local 21 does not violate section 8(e), 29 U.S.C. § 158(e), since the Port, as a public entity, lies outside the jurisdiction of the Act and of the NLRB. *New York Electrical Contractors Ass'n*, 244 NLRB 357 (1979) (holding that picketing to enforce union subcontracting clause in a labor agreement with Port Authority does not violate Sec. 8(b)(4)(A) because the Port and its labor agreement are not subject to the Act.) Therefore, an injunction under section 10(l) of the Act should be denied.

The Petition's alternative request to enjoin various picket line "misconduct" under section 10(j) of the Act should equally be denied because the alleged misconduct ceased on about July 26, 2011, when the Respondents entered into an agreement on picketing conduct with the Port and County Sheriff, its terms confirmed by e-mail. (*See*, Exhibits "S" and "T" to Declaration of Dan Coffman In Opposition To TRO And Preliminary Injunction, filed herewith.)[2] According to the Petition itself, the most recent allegation of misconduct by Respondents occurred a month ago. (See, Petition,¶ 10(eee) at page 13.) Since the end of July 2011, Sheriff Nelson and Local 21 have had periodic meetings to successfully maintain the peace. ( Coffman Decl., ¶ 62 and Exh. "T"). Law enforcement is on the scene and arrests anyone engaged in unlawful activity. Therefore, the Petition should be denied entirely.

## FACTS

Since at least the 1930's, Local 21 has served as the exclusive collective bargaining representative of all longshore, warehouse and maintenance workers employed by the Port of Longview, a public entity under Washington state law, and various private-sector employers

---

[2] *See, also*, the declarations of Kerry Muller, Richard Anderson, Lauran Poage and Matt Hellem, filed herewith.

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 2
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

in and around Longview under successive collective bargaining agreements (CBA's). (Coffman Decl. ¶ 2) As is typical in the longshore industry, most longshore work on the Longview waterfront is casual in nature, and is determined by the needs of the various employers and the shipping schedules of ocean vessels.  For this reason, most Local 21 longshoremen work out of the Port of Longview dispatch hall, where they are dispatched as needed to fill the jobs that are requested by the various employers with which Local 21 has collective bargaining agreements.  (Coffman Decl. ¶4)

The Port is not merely a landlord, like some other public ports.  Instead, the Port is, and for many decades has been, a fully-functioning, working port, and a direct employer of Local 21 longshoremen.  For decades – since the early 1960s – the Port and Local 21 have been (and remain) parties to a collective bargaining agreement known as the "Working Agreement."  The Working Agreement covers all longshore, warehouse, and maintenance and repair (mechanic) work under the control of the Port. (Coffman Decl. ¶ 5)

Under the Working Agreement, the Port has for decades directly employed Local 21 longshoremen to perform all covered work at any and all facilities owned or controlled by the Port.  The Port has never subcontracted out Local 21 work, and has never allowed Port tenants to displace the Local 21 workforce on any facilities owned or controlled by the Port. The Working Agreement for the term 1999-2002 has remained in effect to the present. (Coffman Decl. ¶ 6, Ex. "A")

Until the 1980's, several grain elevator facilities in the Port provided substantial work opportunity for Local 21 longshoremen. In some of the grain elevators facilities, such as Kinder-Morgan, the Port directly employed local 21 longshoremen. Some of the grain

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY INJUNCTION - 3
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

facilities employed Local 21 longshoremen under the Northwest Grain Operators Agreement, a multi-employer, multi-local, collective bargaining agreement that covered grain facilities in various ports of Oregon and Washington.  One such company in the Port, Continental Grain Co., employed Local 21 longshoremen in its grain elevator as well as in its grain storage facility, which was located on the Port property now used by EGT.  In the late 1980's, Continental Grain Co. was the last to close grain elevator operations in the Port.  At around the same time, another grain facility, first operated by Peavey and then by Gavilon, LCC, began employing Local 21 longshoremen in the nearby port of Kalama, Washington.  Local 21 longshoremen are also employed at the CHS grain facility in Kalama, Washington. Because of automation, however, this facility provides substantially less work than did the older grain facilities. The Port of Longview has had no grain facilities in the last twenty years or so until the opening of EGT in July, 2011. (*Id*. at ¶ 7)

Work opportunity for Local 21 longshoremen has further shrunk over the last two decades due to the reduction of the regional logging industry and its related lumber exports. In the last several years, the amount of work available from the Port and its tenants has been significantly less than forty hours per week for Local 21 longshoremen.   Local 21 longshoremen have had to travel to other commercial ports to obtain full time work. (*Id*. at ¶ 8)

Because of the inadequate amount of work opportunity in the Port, Local 21 and the Port have for many years included the following provision in their Working Agreement:

The Port of Longview agrees not to lease property for the sole purpose of performing the work as described in the Working Agreement between the Port and ILWU Local 21, Section XI. definition of work covered, unless the lessee is bound by this Agreement.

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY INJUNCTION - 4
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

(*Id*. at ¶ 9 and Ex. "A")

On about April, 9, 2009, the Port and EGT signed a Memorandum of Understanding (MOU) setting out the basic terms for an intended lease for construction and operation of a new grain elevator.  The MOU contains the following statement:

> EGT has acknowledges that the Port has informed EGT that the Port will not execute a lease relating to the facility until EGT has met and conferred with the International Longshore and Warehouse Union (the "ILWU") regarding the ILWU's claimed jurisdiction with respect to the representation of employees at the facility.

(*Id*. at ¶ 11 and Ex. "B")

The Lease was signed on about June 9, 2009, Lease, and contains the following provisions concerning EGT's employment of Local 21 longshoremen under the Port's Working Agreement:

> **Section 6.3 Warranty of Labor**: Lessor warrants that there are no agreements or restrictions affecting the Port, whether Lessor is a party to the same or otherwise, requiring union labor or prevailing wage compliance (a) in connection with the construction of the Lessee Projects or other Improvements on or about the Premises, or (b) except only as expressly set forth the on Exhibit G-2 hereto, in connection with the operation of the Ship Dock and the Barge Dock, the handling of cargo at the Facility and the operation of the Facility.

The first page of Exhibit "G" under "Disclosures" states:

> Exhibit G setting forth disclosures as to environmental matters and labor matters, is comprised of the following Exhibits, which are attached hereto and incorporated herein by this reference and made a part hererof (and incorporated hereinto and made a part of the Lease):
>
> Exhibit G-1    Environmental Matters
> Exhibit G-2    Labor Matters

The page in the Lease for Exhibit G-2, "Labor Matters," provides:

> Exhibit G-2 LABOR MATTERS – Lessor expressly refers Lessee to the provisions of the Working Agreement between the ILWU Local 21 and the Port, 1999-2002, as extended through the date of this Lease, for Longview, Washington.

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY INJUNCTION - 5
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

(*Id*. at ¶ 12 and Ex. "C")  Given these provisions, Local 21 urged the Port Commissioners to approve the Lease, which they did. (*Id*. at ¶ 13)

Thereafter, EGT and Local 21, with the assistance of Port officials, engaged in numerous meetings, phone conversations and written communications concerning the employment of Local 21 longshoremen and negotiation of a collective bargaining for the EGT facility.[3] (*Id*. at ¶ 20 to 57)) Sometime in late 2009 or early 2010, attorney Rick Liebman, a partner at the law firm of Barran & Liebman, LLP, located in Portland Oregon, became the spokesperson for EGT in its negotiations with Local 21. (*Id*. at ¶ 19)  Throughout most of the negotiations, Liebman maintained that EGT wanted to use Local 21's collective bargaining agreement at the Gavilon facility in Kalama (the "Gavilon Agreement") as the model for an agreement with Local 21. After several meetings between EGT and Local 21 in 2010, Liebman sent a letter, dated September 28, 2010, stating, among other things:

> As I explained to you and your team, our first choice has always been to hire our own employees and try to legally negotiate an agreement for them which is substantially similar to the Gavilon Agreement. That option remains our most desired result. I recognize that your union has consistently rejected this option.
>
> Failing to agree upon the Gavilon option, the company still has not decided whether to utilize a contractor for the work at the site (with those persons very likely represented by a different union) or to continue to explore the option of a special board on local 21's hiring all. The impediment at this point is the pension plan and I believe that it would be premature for us to set up negotiations when the company has yet to decide how it will staff the facility.

(*Id*. at ¶ 19 and Ex. "G")

In October 2010, Local 21 alerted the Port Commissioners that it appeared EGT was about to renege on its agreement under the Lease to employ Local 21 longshoremen. Port

---

[3] The details of each of these meetings, conversations and written correspondences are set out in full in the Coffman Declaaration ¶ 17 to ¶ 59.

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY INJUNCTION - 6
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

Director O'Hollaren discussed the matter with EGT officials and Liebman, urging them to finalize an Agreement with Local 21. (*Id*. at ¶ 32) By letter dated November 3, 2010, Liebman to conveyed Local 21 encouraging words for possible agreement, including the following:

> Starting in January of this year, EGT has been convinced that the Gavilon Agreement is by far the best way to go. The agreement would give us our own highly trained, reliable and dedicated workforce that would work solely at our facility and regularly operate our highly technical equipment rather working at a variety of operations at numerous locations. Negotiating such an agreement would ensure that the ILWU would have a presence at our facility and would ensure that we have a regular, highly trained workforce which is crucial to us establishing a competitive, successful operation in Longview. We would like to figure out a way to legally be able to negotiate a Gavilon-style agreement. We trust you and your team and we also appreciate the creativity of your union and your desire to make it work.
> 
> *     *     *
> 
> We have also determined that using the port as a contractor is not an option.
> 
> *     *     *
> 
> Please, Dan, I would very much appreciate it if you and your team would again think about the Gavilon Agreement and its advantages for both of us. EGT and I remain hopeful that the Gavilon-style agreement can be the end result here. Our failure to reach that end will result in us having no choice but to engage a third-party contractor for work at the site. While we would engage a union contractor for this work, it would likely not be ILWU, as I am unaware of any ILWU represented contractors that might be available to do the work.

(*Id*. at ¶ 33 and Ex. "H") However, after another unsuccessful meeting with EGT, Local 21 informed the Port contract negotiations were not going well. (*Id*. at ¶ 35, 36)

On or about December 3, 2010, O'Hollaren sent a letter to Larry Clark, CEO of EGT, reminding the company that it had agreed under the Lease to employ Local 21 longshoremen and work with Local 21 concerning the operation of the facility. (*Id*. at ¶ 37 and Ex. "J")

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY INJUNCTION - 7
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1   Port officials held a meeting with EGT and Local 21 on January 13, 2011 where EGT

2   agreed[4] to hold a series of contract negotiations with Local 21 on January 31 to February 2,

3   February 10-12 and February 18, 2011. The parties then agreed to hold three consecutive

4   bargaining sessions on January 31, 2011, February 1, 2011 and February 2, 2011, and two

5   more on February 10 and 11, 2011, at the Monticello Hotel in Longview. Liebman urged that

6   the parties wrap up an agreement by the end of February 11. (*Id*. at ¶ 38)

7

8       The January 31 to February 2 bargaining sessions covered the following issues: hours

9   of work, establishment of a special dispatch board for EGT in the Local 21 dispatch hall,

10   training, length of agreement, safety issues, grievance and arbitration provisions, a no-

11   strike/no-lockout clause and payrolling issues. (*Id*. at ¶ 40) At the February 1, 2011 meeting,

12   the parties had extensive negotiations over a comprehensive drug and alcohol policy

13   document presented by EGT (*Id*. at ¶ 41 and Ex. "K")

14

15       During the February 10-12 negotiations, EGT presented a proposed, comprehensive,

16   contract document between EGT and Local 21, for the "landside" or "in-house" operations,

17   that ran to March 30, 2016. (*Id*. at ¶ 43 and Ex. "L"). EGT also presented another contract

18   proposal for the "shipside" operations, involving the loading of grain from the EGT dock

19   onto vessels. (*Id*. at ¶ 43 and Ex. "M") The parties reviewed and discussed EGT's proposed

20

21

22

23   [4] At the January 13, 2010 meeting, Liebman informed Local 21 and the Port that EGT had come around to
     seriously wanting to make a deal with Local 21 that would include the longshore industry PMA benefit plans,
     which EGT had previously been worried about; but in order to position itself, and in case the parties could not
24   finalize a deal, EGT had just filed a lawsuit against the Port to get a court determination whether EGT is legally
     obligated to employ Local 21 longshoremen under the Lease. Local 21 responded that they were very glad to
25   hear of EGT's decision to include the ILWU-PMA benefit plans in an Agreement with Local 21 and that Local
     21 continues to believe that EGT is obligated to employ Local 21 longshoremen and be bound by the Working
26   Agreement under the Lease as insisted by the Port. (Coffman Decl. at ¶ 38)

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 8
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1    contract documents, line by line.[5] The parties eventually identified two major issues in

2    dispute – EGT's demand that longshoremen work 12 hour shifts, without any overtime pay,

3    and that no longshoremen be allowed to work in the master console or control room. Local

4    21 was equally adamant that longshoremen be paid overtime for work in excess of eight

5    hours in a day and that at least one longshoreman be assigned to work in the console room.

6    (*Id*. at ¶ 43)

7

8         On February 17, 2011, Local 21 e-mailed to Liebman its counter, contract proposal

9    that was a redlined, mark-up, with new language, of  EGT's contract proposal. (*Id*. at ¶ 44

10   and Ex. "O")  At the February 18, 2011, meeting, Liebman told Local 21 that EGT was in

11   agreement with about 90% of the union's counterproposal but that the two disputed issues

12   remained sticking points, namely 12 hour shifts without overtime pay and no longshoremen

13   assigned to work in the console room. Liebman said EGT's position came from Local 21's

14   Gavilon Agreement, that the company will not deviate from its position on these points and

15   that if the union did not agree to both demands, there was no point to further discussions. The

16   EGT representatives then left. (*Id*. at ¶ 45)

17

18        Local 21 sent letters to Liebman, on April 1 and April 15, 2011, asking to "get back

19   to the table" to resolve the two outstanding issues. (*Id*. at ¶ 47 and 48, Ex. "P" & "Q")

20   Liebman replied by letter dated April 25, 2011, in which he stated, among other things:

21

22         While you originally indicated that you would be willing to agree to the Gavilon
           terms, you made it very clear during our last discussion that you could never agree to
23         such conditions. Accordingly, it does not appear that it would be fruitful for us to
           discuss these same items yet again if your position remains unchanged. If

24

25   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

     [5] Also during the February 10-12 negotiations, EGT gave Local 21 a one-page document that EGT explained
26   showed an alternating weekly work schedule of three 12-hour-shifts for two employee groups -- "Team A" and
     "Team B" -- with optional overtime pay to be worked on Sundays by biding. (*Id*. at ¶ 43 and Ex. "M")

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 9
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

circumstances have changed and you would be willing to provide us a written proposal prior to meeting that is substantially similar to the Gavilon Agreement, however, we would welcome the opportunity to continue discussions with you.

Liebman's April 25, 2011 letter, however, ended with a statement of pre-conditions, which

Local 21 would have to agree to, for any further meetings:

Please be advised that we will require a written acknowledgment from you prior to any such meeting that any such discussions are settlement discussions only and, pursuant to Washington Evidence Rule 408, the contents of any discussions and any documents that flow out of any such discussions will not be admissible for any reason whatsoever in any current or future litigation involving the parties and will not be mentioned in any way, including in the press or any court filings.

Please let me know if this procedure is acceptable to you.

(*Id*. at ¶ 49, Ex. "R") Local 21 did not respond and this was the last communication between

the parties. (Or *Id*. at ¶ 50)

At no other time during the many meetings, phone conversations and discussions with EGT representatives, did Liebman or any other EGT representative ever place conditions, qualifications or ground rules on our contract negotiations. In particular, no EGT representative ever stated that the bargaining sessions were "off the record" or restricted in any way. (*Id*. at ¶ 50).

## **ARGUMENT**

### **A.    The Petition Improperly Proposes Restraint on Free Speech and A "Mandatory" Injunction, Which the Courts Disfavor.**

The requested injunction contains provisions for affirmative actions, which constitute a mandatory, as opposed to a prohibitory, injunction, requiring a heightened legal standard an opportunity to be heard.  It is well established that mandatory preliminary injunctions—those that would alter the status quo—are "subject to a heightened scrutiny and should not be

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY INJUNCTION - 10
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1  issued unless the facts and the law clearly favor the moving party." *Dahl v. HEM*

2  *Pharmaceuticals, Inc.* 7 F.3d 1399, 1403 (9th Cir. 1993).  Such injunctions are "particularly

3  disfavored," and are not granted "unless extreme or very serious damage will result" or

4  "issued in doubtful cases or where the injury complained of is capable of compensation in

5  damages." *Marlyn Neutraceuticals v. Mucos Pharma Gmbh & Co.,* 571 F.3d 873, 879 (9th

6  Cir. 2009).

7

8        District courts must exercise discretion regarding preliminary injunctions by focusing

9  on a familiar set of four equitable factors: the movant's likelihood of success on the merits;

10  the possibility of irreparable injury to the moving party; the extent to which the balance of

11  hardships favors each party; and whether the public interest will be advanced by granting the

12  preliminary relief. *Overstreet v. Carpenters Local 1506,* 409 F.3d 1199, 1209 (9th Cir. 2005).

13  At "an irreducible minimum, the moving party must demonstrate a fair chance of success on

14  the merits." Id. at 460 (quotation and citation omitted).*Overstreet v. Carpenters Local 1506,*

15  409 F.3d at 1207 (9th Cir. 2005).

16

17        Most importantly, the court must carefully determine whether the proposed injunction

18  "presents a significant risk that the First Amendment will be infringed." *Overstreet v.*

19  *Carpenters Local 1506,* 409 F.3d 1199, 1209 (9th Cir. 2005).  The Supreme Court long ago

20  held that the state may not "impair the effective exercise of the right to discuss freely

21  industrial relations which are matters of public concern." *Thornhill v. Alabama*, 310 U.S. 88,

22  104 (1940).   Equally established, "the streets are natural and proper places for the

23  dissemination of information and opinion; and one is not to have the exercise of his liberty of

24  expression in appropriate places abridged on the plea that it may be exercised in some other

25

26

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 11
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

place." *Id.* at 105-106, quoting *Schneider v. New Jersey,* 308 U.S. 147, 161 (1939) (emphasis supplied). Workers' right to organize, as guaranteed by the National Labor Relations Act, "comprehends whatever may be appropriate and lawful to accomplish and maintain such organization." *Thomas v. Collins*, 323 U.S. 516, 534 (1945). It is indisputable that a constitutional injury, such as a prior restraint on a union's freedom of speech, cannot be remedied by money damages. *Overstreet v. United Brotherhood of Carpenters,* 409 F.3d at 1218, *citing Bantam Books Inc. v. Sullivan,* 372 U.S. 58, 70 (1961). Accordingly, a "heavy presumption exists against finding such prior restraints constitutionally permissible." *Id.* And, "where, as here, there is at least some risk that constitutionally protected speech will be enjoined, only a particularly strong showing of likely success, and of harm to the defendant as well, could suffice." *Overstreet, 409 F.3d at 1208, n.7.* "[B]ecause of the First Amendment backdrop in this case, ordinary principles of deference to Board interpretation of the Act do not apply here." *Id*. at 1207. Under these constitutional restrictions, the proposed injunction to ban even peaceful picketing at the EGT facility must be denied.

Moreover, "although the district court's review of a petition under § 10(l ) of the Act ought not attempt to resolve the merits of the NLRB's claim that an unfair labor practice exists, the court nevertheless must examine closely the soundness of the Regional Director's legal position." *Production Workers Local 707 v. NLRB*, 793 F.2d 323, 332 (D.C.Cir.1986) Indeed, Judge Friendly's careful analysis of the legislative history of § 10(l ) led the Second Circuit in *Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union*, 494 F.2d 1230, 1245 (2d Cir.1974), to conclude that if a district court is "convinced" that the NLRB's legal position is wrong, it should not issue an injunction under § 10(l ). *Production*

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY INJUNCTION - 12
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1   *Workers Local 707 v. NLRB*, 793 F.2d at 332.  Here, Petitioner's legal position as to

2   violations of section 8(b)(4)(A) and 8(b)(4)(B) lacks any supporting facts or law.

### B.   There Is No 8(B)(4)(A) Violation, As A Matter Of Law, Because There Is No Violation Of Section 8(e), Which Is The Statutory Predicate.

5   Section 8(b)(4)(i) and (ii)(A) of the Act prohibits picketing with an object of enforcing an

6   agreement that contains an unlawful "hot cargo" provision restricting subcontracting of work

7   to union employers only in violation of section 8(e) of the Act. It is well-established,

8   however, that since the Act does not apply to a public entity, such as the Port, it may lawfully

9   enter into labor agreements that contain "hot cargo" provisions, within the meaning of section

10  8 (e), restricting any subcontracting of work to union employers only. *Local 3, International*

11  *Brotherhood of Electrical Workers (New York Electrical Contractors Ass'n.)* 244 NLRB 356,

12  357 (1979). And where, in such circumstances, there is an absence of a section 8 (e)

13  violation, picketing to enforce a labor agreement with a public port "cannot be found

14  violative of Section 8(b)(4)(i) and (ii)(A) of the Act." *Local 3, International Brotherhood of*

15  *Electrical Workers (New York Electrical Contractors Ass'n.)* 244 NLRB at 357. Accordingly,

16  any picketing by Respondents with an object to enforce the lawful Working Agreement

17  between Local 21 and the Port would not violate section 8(b)(4)(i) and (ii)(A) of the Act.

20  Evidently recognizing this legal impediment, the Petitioner asserts a more convoluted and

21  fanciful claim -- that Local 21 had demanded that EGT enter into a labor agreement

22  prohibiting subcontracting to private companies unless the subcontractor is bound to the

23  Working Agreement that Local 21 has with the Port or any other employer as alleged in

24  paragraph 6 (A) of the NLRB complaint, dated August 29, 2011. Nothing close to this was

25  ever stated by local 21 in its numerous meetings and correspondence with EGT. (*Coffman*

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 13
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

*Decl* at ¶ 52) Indeed, Petitioner's evidence on this point merely reflects that Local 21 claimed that EGT was bound by the Working Agreement, which, of course, is undisputed.

However, nothing in the Working Agreement says anything about subcontractors of EGT. The Petitioner focuses on the following provision in the Working Agreement:

> The Port of Longview agrees not to lease property for the sole purpose of performing the work as described in the Working Agreement between the Port and ILWU Local 21, Section XI. definition of work covered, unless the lessee is bound by this Agreement.

This provision, on its face, concerns only the Port's leasing of property and prohibits the Port from making leases "for the sole purpose" of having its tenants perform traditional longshore work that Local 21 members have performed directly for the Port for many decades. This particular provision was negotiated with the Port to prevent the further erosion of longshore work opportunity, which has caused the Local 21 work force to have significantly less than full-time work opportunity in the Port. This provision says nothing about subcontracting; the word, "subcontracting," is not in this provision; nor does the provision say anything about a tenant of the Port, such as EGT, subcontracting with another company. (*Coffman Decl*. at ¶ 53) Consequently, Petitioner's carefully pleaded theory to get around the jurisdictional impediment here utterly fails for lack of any supporting evidence.

### C.     The Undisputed Facts Show There Is No 8(b)(4)(B) Violation

#### 1.     Section 8(b)(4)(B) Protects Picketing against a Party Who is Not "Neutral" Nor "Wholly Unconcerned" in the Labor Dispute.

Section 1 of the Act, 29 U.S.C. § 151 ("Findings and Declaration of Policy"), sets out Congressional findings that Congress sought to speed the flow of commerce in two specific ways: first by protecting the rights of employees to organize and bargain collectively; and

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY INJUNCTION - 14
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

second by prohibiting "certain practices" by unions-*i.e.,* unfair labor practices - that burden

commerce. "Thus, the Act seeks to aid commerce not by setting up the Board as grand

diviner of what will serve that end, but in specific ways through specific provisions with their

own specific policies." *Production Workers Local 707 v. NLRB*, 793 F.2d at 332.

Section 8(b)(4)(B), when stripped to its relevant essentials, provides that it shall be an

unfair labor practice for a union (i) to induce an employee to refuse to work or (ii) to

threaten, coerce or restrain any person, if an object of the behavior described in (i) or (ii) is

"(B) forcing or requiring any person to cease doing business with any other person ...

Provided that nothing in this clause (B) shall be construed to make unlawful, where not

otherwise unlawful, any primary strike or primary picketing." *Id.*  at 327.  Section 8(b)(4) is

usually dubbed the "secondary boycott provision" and that a secondary boycott is the use of

pressure on a neutral, third party in order to gain objectives in a dispute with a different,

primary party. *Id.*

Congress made clear in this section, however, that a labor organization could engage in a

"primary strike" or "primary picketing." The provision thus embodies twin congressional

objectives: "preserving the right of labor organizations to bring pressure to bear on offending

employers in primary labor disputes and ... shielding unoffending employers and others from

pressures and controversies not their own." *NLRB v. Denver Bldg. & Constr. Trades Council*,

341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951).  In *NLRB v. Denver Building

and Construction Trades Council,* the Court recognized that the language of the provision

would bar virtually all union involvement in picketing, even that specifically protected by

other provisions of the Act. The Court, therefore, looked instead to the purposes of the

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 15
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

provision, , observing that the section "often is referred to in the Act's legislative history as one of the Act's 'secondary boycott sections,' " and citing Senator Taft's remark, quoted above, that the provision does no more than make secondary boycotts illegal. *Id.* at 686, 71 S.Ct. at 950. Finally, the Court described the policy behind this prohibition as "shielding unoffending employers and others from pressures in controversies not their own." *Id.* at 692, 71 S.Ct. at 953. "For the *Denver Building* Court, then, the quality that makes pressure "secondary" was the same as that reflected in the legislative history: it is brought against a third party not involved in the underlying dispute." *Production Workers Local 707 v. NLRB*, 793 F.2d at 329.

The Petitioner here incorrectly adopts the presumption that all such labor organization picketing is unlawful unless proven to be in the narrow category of "primary" activity.  In *National Labor Relations Board v. Fruit and Vegetable Packers and Warehousemen, Local 760*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964), the Supreme Court described the presumption in favor of peaceful picketing that underlies the nation's laws concerning labor relations:

> Throughout the history of federal regulation of labor relations, Congress has consistently refused to prohibit peaceful picketing except where it is used as a means to achieve specific ends which experience has shown are undesirable. ... We have recognized this congressional practice and have not ascribed to Congress a purpose to outlaw peaceful picketing unless "there is the clearest indication in the legislative history," ... that Congress intended to do so as regards the particular ends of the picketing under review. Both the congressional policy and our adherence to this principle of interpretation reflect concern that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment.

Id. at 62-63, 84 S.Ct. at 1066 (footnotes omitted). The Court's discussion of this presumption in favor of picketing was applied in its interpretation of § 8(b)(4) in which it found this

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY INJUNCTION - 16
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

section's prohibition of secondary boycotts has a "narrow focus." Id. at 63, 84 S.Ct. at 1066.

In *National Woodwork*, the Court considered whether a union's strike against a general contractor who used pre-machined doors instead of those fitted by union carpenters on the jobsite was a secondary strike in violation of section 8(b)(4)(B). Recognizing that the core concept of the section was aimed at preventing "pressure tactically directed toward a neutral employer in a labor dispute not his own," id. at 623, 87 S.Ct. at 1257 the Court held that the boycott was not an unfair labor practice because it related to the working conditions of the jobsite carpenters. The Court's definition of a "primary dispute" focused generally on the directness of the union's grievance and the ability of the boycotted employer to control its resolution, but was by no means clear-cut. "The determination whether ... Section 8(b)(4)(B) [was violated] cannot be made without an inquiry into ... all the surrounding circumstances." *Id.* at 644, 87 S.Ct. at 1268. *Chipman Freight Services v. NLRB,* 843 F.2d 1244, 1226 (9th 1988).

Thus, "the core distinction between primary and secondary activities is the neutrality of the entity against which the disputed activity is directed: Section 8(b)(4) was designed to prohibit only pressure brought to bear on 'a third person who is wholly unconcerned in the disagreement,' whether that pressure is called a 'secondary boycott' or 'secondary activity.' " Id. at 328 (citing 93 Cong.Rec. 4198 (1947) (remarks by Senator Taft on section 8(b)(4)). *Chipman Freight Services v. NLRB,* 843 F.2d 1244, 1226 (9th 1988)("Chipman is clearly not a neutral third party, because agreements it attempted to impose upon the independent subhaulers are the sole object of the picketing." *Id.* at 1227); and, *Production Workers Local 707 v. NLRB*, 793 F.2d at 329. Moroever, "the Conference Report accompanying the Act

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 17
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

specified that the section does not prohibit "the primary strike for recognition."  *Production Workers Local 707 v. NLRB*, 793 F.2d at 328-29.

It is well recognized that "the caselaw has universally and unambiguously held that Congress intended Section 8(b)(4) to protect only neutral parties-and not even all neutrals-from coercion in disputes not their own."  See, *Production Workers Local 707 v. NLRB*, 793 F.2d at 329 -330, and cases cited therein.  The Supreme Court has repeatedly described Congress' purpose in Section 8(b)(4) as protecting "unoffending employers," "the helpless victims of quarrels that do not concern them at all."*See, e.g., Edward J. Debartolo Corp. v. NLRB,* 463 U.S. 147, 103 S.Ct. 2926, 2932, 77 L.Ed.2d 535 (1983); *International Longshoremen's Association, AFL-CIO v. Allied International, Inc.,* 456 U.S. 212, 223 n. 20, 225, 102 S.Ct. 1656, 1663 n. 20, 1664, 72 L.Ed.2d 21 (1982) (*ILA* ); *National Woodwork,* 386 U.S. at 626-27, 87 S.Ct. at 1258-59.  *Id*. at 330.

### 2.   EGT is Not a Neutral and Therefore Is A Lawful Target of Picketing

Here, the Petitioner has selectively overlooked § 8(b)(4)(B)'s underlying purpose of protecting neutral parties. He has likewise ignored the fact that the proposed injunction will not advance either of the purposes that it accurately ascribes to the section. In this way, the present case is similar to  *Production Workers Local 707 v. NLRB*, where the court found a cab company to not be a neutral even though the Union was picketing for recognition and to start contract negotiations. 793 F.2d at 325.  Here, EGT has had a far more expansive and substantive relationship with Local 21 arising from its many months of contract negotiations. To find that EGT is not "wholly unconcerned" with the existing labor, would be to ignore the

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY INJUNCTION - 18
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

extensive meetings and contract negotiations are conducted with Local 21, the failings of which, directly triggered the picketing herein.

The fact that picketing at the EGT facility has an impact on other companies, such as General Construction, that do business at the facility, does not it make unlawful. Under Section 8(b)(4)(B), primary picketing may lawfully have secondary effects on third-parties. *NLRB v. Int'l Rice Milling Co.*, 341 U.S. 665 (1951) (holding that union acted lawfully in engaging in primary strike, even though employees of neutral employers turned away at picket line, and explaining that "Congress did not seek, by § 8(b)(4), to interfere with the ordinary strike…"), citing *Int'l Union of Automobile Workers of Am. v. O'Brien*, 339 U.S. 454 (1950). The Supreme Court has emphasized, "Section 8(b)(4)(B) … reflects a concern with protecting labor organizations' right to exert legitimate pressure aimed at the employer with whom there is a primary dispute. … *This primary activity is protected even though it may seriously affect neutral third parties.*" *NLRB v. Local 825, Int'l Union of Operating Engineers*, 400 U.S. 297, 303 (1971) (emphasis added). And, as the Board long ago held:

> Picketing at a principal place of business may have an effect on (1) strikers, (2) nonstriking employees, (3) replacements, (4) customers and their employees, (5) suppliers and their employees, (6) trucking and other delivery companies and their employees, and (7) the remainder of the public. *Whatever secondary effects are here involved are necessarily subordinate to the right to strike and picket for clearly primary purposes.*

*Freight, Construction, General Drivers Union, Local 287 (Buck's Butane – Propane Service, Inc.)*, 186 NLRB 187, 195 (1970) (emphasis added).

Under this standard, Local 21 is not guilty of any wrongdoing as charged. Local 21 is engaged in lawful, primary concerted activities. Its complaint here concerns a single,

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY INJUNCTION - 19
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1   primary employer with which it has a collective bargaining agreement – EGT – and concerns

2   a primary dispute – EGT's refusal to comply with the terms of the labor contract to which it

3   is bound.  Moreover, *all* of Local 21's concerted actions have occurred at the EGT facility,

4   and has been directed solely at EGT.  (*See* Coffman Decl. ¶ 9.)

5           In this regard, there is certainly nothing unlawful with Local 21 conducting picketing

6   and other protected, concerted actions at the EGT facility when General Construction

7   employees show up to do the work covered by Local 21's Working Agreement with EGT.

8   Local 21 only learned about EGT subcontracting the work to General Construction from

9   media reports about a week ago. EGT failed to give notice to Local 21, let alone bargain with

10  it, before subcontracting the work General Construction in violation of Section 8(a)(5) of the

11  Act.  *See, e.g.*, *Fibreboard Corp. v. NLRB*, 379 U.S. 203 (1964) (employer obligated to

12  bargain with union before subcontracting bargaining unit work).  (*See* Coffman Decl. ¶ 10.)

13  Clearly, EGT is attempting to evade its obligations under the Working Agreement by the

14  trick of subcontracting out the entire bargaining unit to a third party company, General

15  Construction, which has its own workforce represented by Operating Engineers Local 701.

16          That General Construction employees are members of another union does not change

17  the underlying fact that they are replacement workers – that is, scabs – as to Local 21

18  members.  (*See* Coffman Decl. ¶ 10.)  It is entirely lawful for one of Local 21's aims in

19  picketing EGT to be the total cessation of employment of this scab labor, union or not, that

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 20
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1    displaces Local 21 unit members.[6]   *See, e.g.*, *Brewery Workers Local 8 (Bert P. Williams,*

2    *Inc.)*, 148 NLRB 728, 734 (1964).

3          And to the extent that Local 21's primary labor dispute with EGT has interfered with

4    BNSF's deliveries of grain to the EGT facility, this too is wholly lawful.  As noted above,

5    Local 21 has restricted its actions to the EGT facility.  It has not targeted BNSF sites.  (*See*

6    Coffman Decl. ¶ 9.)  Any interruption in BNSF operations at the EGT facility has been a

7    lawful side-effect of this primary activity.  As the Supreme Court and the Board have

8    emphasized, such side-effects are an inevitable – *and entirely lawful* – consequence of

9    primary picketing.  *See, e.g.*, *Local 825, Int'l Union of Operating Engineers*, 400 U.S. at 303;

10   *Buck's Butane – Propane Service, Inc.)*, 186 NLRB at 195.

11

12              **3.      The Undisputed Evidence Shows That Local 21 Has a Lawful
                          Labor Dispute With EGT**

13

14   The Petition, on its face, grossly mischaracterizes the evidence and circumstances.

15   Respondents urge the court to allow them a reasonable opportunity to collect evidence and

16   legal authorities that will convincingly refute Petitioner's Core claims and legal theories. The

17   Petition alleges that the picketing and collective actions constitute unlawful, "secondary"

18   conduct on the theory that Local 21's labor dispute is really with General Construction Co., a

19

20   subcontractor of EGT, rather than EGT itself.  This turns the real facts on their head.

21

22   _____

23   [6]  Indeed, while Local 21 has limited all of its actions to EGT, it would be perfectly lawful for Local
     21 to directly target General Construction under the so-called "Ally" Doctrine.  As no less a figure

24   than Senator Robert Taft – co-author of the Taft-Hartley Act – explained, "The spirit of the Act is not
     intended to protect a [business that] is cooperating with a primary employer and taking his work and

25   doing the work [the primary] is unable to do because of the strike."  John E. Higgins (ed.), *The
     Developing Labor Law*, Vol. 2 (5th ed. 2006) at 1798, citing 95 Cong.Rec. 8709 (1947).

26   Accordingly, "if the neutral's employees perform work that would be that of the striking employees,
     the neutral becomes an ally and forfeits its neutrality…"  *Id*. at 1799 & n.277, citing cases.

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 21
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1
2
3
4
5
6
7
8

The Petition utterly ignores the documented truth, that EGT sat down with Local 21 and engaged in direct, extensive, contract negotiations concerning the employment terms for the longshoremen the company would be employing; that in April, 2011, the contract negotiations got stalled over EGT's demand to have the longshoremen work 12 hour shifts without any overtime pay; and, that EGT, and without any notice to Local 21, transferred the longshore facility work from Local 21 longshoremen to a subcontractor, General Construction.  (Coffman Decl ¶ 19 to 61)

9
10
11
12
13
14
15
16
17
18

Still, the NLRB is creating the fiction that Local 21's labor dispute is somehow with General Construction and not with EGT because that is the only possible scenario that would support a claim for unlawful, "secondary" activity. However, at no time during the many meetings, phone conversations and discussions with EGT representatives, did Local 21 representative ever demand that General Construction Company enter into a collective-bargaining agreement with Local 21. In fact, no representative of Local 21 has had any direct communications with any officials or representatives of General Construction Company. Local 21 has never had any interest in having a collective-bargaining relationship or agreement with General Construction Company.  (Coffman Decl ¶ 54)

19
20
21
22
23
24

When Local 21 began picketing the EGT facility early July, this was before EGT had hired General Construction.  Local 21 plainly had no idea that EGT had subcontracted the operations work to another company. The Petition indicates that EGT did not contract with General Construction until about July 13, 2011, weeks after Local 21 began its picketing and collective activities directed at EGT.   (Coffman Decl ¶ 56)

25
26

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY INJUNCTION - 22
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1   It was not until the weekend of July 16-17, 2011, that Local 21 first learned from an
2   article in the local newspaper, the *Daily News*, that EGT had entered into a contract with
3   General Construction Company to staff the facility.  EGT never gave notice to Local 21
4   about its contract with General Construction, and never bargained with Local 21 about this
5   decision.  (Coffman Decl ¶ 57)
6
7   Nor has Local 21 ever made any demand that General Construction recognize Local
8   21.  Local 21's position is that EGT cannot use this workforce because it is required under
9   the terms of the Lease to employ Local 21 longshoremen at its facility. (Coffman Decl ¶ 58)
10  Local 21 has never picketed General Construction Co., except when it, and other
11  contractors, suppliers and customers, enter and exit the EGT facility.  Local 21 has never
12  demanded that General Construction Co. or any other company, besides EGT, employ Local
13  21 longshoremen at the EGT facility.  At all times, Local 21's <u>only</u> demand has been that
14  EGT honor its Lease and employ Local 21 longshoremen. (Coffman Decl ¶ 59)
15
16  Because Local 21's labor dispute is with EGT, which is not a neutral, federal labor
17  law entitles the Respondents to conduct picketing and other collective actions directed at
18  EGT.

19
20  **D.      The Record Does Not Warrant an Injunction under § 10(j) as to Picketing "Misconduct"**

21  While the NLRB Complaint also asserts that Local 21 has engaged in various kinds of
22  picket line misconduct, the Union has direct evidence showing that most of the trouble has
23  been manufactured by a professional strike-breaker and labor provocateur from the East
24  Coast named, Tom Butts. *See, also*, the declarations of Kerry Muller, Richard Anderson,
25  Lauran Poage and Matt Hellem, filed herewith. Moreover, since July 25, 2011, Local 21
26

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 23
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1   representatives have negotiated and maintained picket line peace with the Cowlitz County

2   Sheriff Mark Nelson.  (*Coffman Decl.* ¶ 59 - 61). Accordingly, an injunction to stop

3   "misconduct" on the picket line is unwarranted.

4   <u>**CONCLUSION**</u>

5

6        For the above reasons, the petition for a preliminary injunction to ban peaceful

7   picketing under section 10(l) of the Act and, alternatively, to enjoin picketing "misconduct"

8   under section 10(j) of the Act should be denied in its entirety.

9        RESPECTFULLY SUBMITTED this 6th day of September, 2011.

10

11                           By:     /s/ Robert Lavitt_____

12                                  Robert H. Lavitt, WSBA# 27758
                                    SCHWERIN CAMPBELL BARNARD IGLITZIN

13                                  & LAVITT LLP
                                    18 West Mercer Street, Suite 400

14                                  Seattle, WA 98119
                                    Tel: (206) 257-6004

15                                  Fax: (206) 257-6039

16                                  *Lavitt@workerlaw.com*

17                           By:     /s/ Robert S. Remar_____

18                                  Robert S. Remar, Cal. Bar # 100124.
                                    s/Phil A. Thomas_____

19                                  Phil A Thomas, Cal. Bar #248517

20                                  LEONARD CARDER, LLP
                                    1188 Franklin Street, Suite 201

21                                  San Francisco, California 94109
                                    Tel:   415-771-6400

22                                  Fax:   415-771-7010

23                                  rremar@leonardcarder.com
                                    pthomas@leonardcarder.com

24                                  *Petitions for Pro Hoc Vice Admission To*
                                    *Be Filed*

25

26

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 24
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Attorneys for Defendants*, ILWU,
LOCALS 21 and 4

RESPONDENTS' OPPOSITION TO PETITION FOR PRELIMINARY
INJUNCTION - 25
Case No.  C10-5684 RBL

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828

1

CERTIFICATE OF SERVICE

2

I hereby certify that on this 1st day of September, 2011, I caused the foregoing

3

Respondent's Motion to Continue TRO Hearing to be filed with the Court using the CM/ECF

4

system, which will send notice of such filing to:

5

6
Anne Pomerantz
*Anne.Pomerantz@nlrb.gov*

7
Daniel Sanders
*Daniel.Sanders@nlrb.gov*

8
John Fawley
*John.Fawley@nlrb.gov*

9
Helena Fiorianti
*Helena.Fiorianti@nlrb.gov*

10
NLRB, Region 19

11
2948 Jackson Federal Building
915 Second Avenue

12
Seattle, WA  98174

13

14

15
 s/ Robert H. Lavitt_____
Robert H. Lavitt, WSBA No. 27758

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE
Case No.  C10-5684 BHS

LAW OFFICES OF
SCHWERIN CAMPBELL
BARNARD IGLITZIN & LAVITT, LLP
18 WEST MERCER STREET SUITE 400
SEATTLE, WASHINGTON 98119-3971
(206) 285-2828